**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL MCNEIL, guardian ad litem
as to CLM; CLM, by and through
Michael McNeil guardian ad litem;
JULIE MCNEIL, individually,
            *Plaintiffs-Appellants*,
            v.

SHERWOOD SCHOOL DISTRICT 88J;
HEATHER H. CORDIE; KEN BELL;
BRIAN BAILEY; PETER MILLER; GARY
BENNETT,
            *Defendants-Appellees*.

No. 17-35500

D.C. No.
3:15-cv-01098-
SB

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael H. Simon, District Judge, Presiding

Argued and Submitted October 9, 2018
Portland, Oregon

Filed March 14, 2019

Before: Raymond C. Fisher and Consuelo M. Callahan,
Circuit Judges, and Cathy Ann Bencivengo,* District Judge.

Per Curiam Opinion

---

* The Honorable Cathy Ann Bencivengo, United States District Judge
for the Southern District of California, sitting by designation.

**SUMMARY**[**]

---

**Civil Rights**

The panel affirmed the district court's summary judgment in favor of a school district in an action brought pursuant to 42 U.S.C. § 1983 by student CLM and his parents alleging that the district violated plaintiffs' First Amendment and Fourteenth Amendment substantive due process rights when it expelled CLM for one year.

CLM, then a high school sophomore at Sherwood High School, created in his personal journal a hit list of students that "must die." When his mother discovered the hit list, she told a therapist, who informed the police, who told the school district.

The panel held that under the particular facts in this case, including the nature of the hit list, CLM's access to firearms, and the close proximity of CLM's home to the high school, the decision to discipline CLM for his off-campus speech did not violate his constitutional right to free speech. The panel held that when considering whether a school district may constitutionally regulate off-campus speech, courts must determine, based on the totality of the circumstances, whether the speech bears a sufficient nexus to the school. The panel stated that there is always a sufficient nexus between the speech and the school when the school district reasonably concludes that it faces a credible, identifiable threat of school violence. The panel further held that a student's lack of intent

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to convey his off-campus speech to any third party is relevant to an evaluation of whether the speech constitutes a credible threat, but is not dispositive.

The panel held that the claim brought by CLM's parents alleging substantive due process violations failed because their fundamental right to choose CLM's educational forum was not infringed by the School District's discipline of CLM.

---

## COUNSEL

Adam S. Heder (argued) and Roger K. Harris, Harris Berne Christensen LLP, Lake Oswego, Oregon, for Plaintiffs-Appellants.

Blake H. Fry (argued) and Peter R. Mersereau, Mersereau Shannon LLP, Portland, Oregon, for Defendants-Appellees.

---

## OPINION

PER CURIAM:

CLM, then a high school sophomore at Sherwood High School ("Sherwood High"), created in his personal journal a hit list of students that "must die." When his mother discovered the hit list, she told a therapist, who informed the police, who told Sherwood School District ("School District"). The School District expelled CLM for one year. CLM sued the School District primarily on First Amendment grounds, and the district court held that the expulsion was constitutional. On appeal, CLM and his parents ("Appellants") assert that the School District cannot

constitutionally regulate student speech that the student never intended to communicate to any third party. We conclude that under the particular facts in this case, including the nature of the hit list, CLM's access to firearms, and the close proximity of CLM's home to Sherwood High, the School District did not violate any of Appellants' asserted constitutional rights.

## I.

On or about May 25, 2014, CLM created a "hit list" in his personal journal, naming 22 Sherwood High students and one former employee, and stating "I am *God*" and "All These People *Must* Die." On September 8, 2014, soon after CLM started his junior year at Sherwood High, CLM's mother, Mrs. McNeil, discovered the journal on CLM's nightstand while cleaning CLM's room. Upon reviewing the journal's contents, Mrs. McNeil came across the hit list and additional entries containing graphic depictions of violence. Mrs. McNeil made copies of some of the journal entries, including the hit list, and sought guidance from a therapist the next day regarding her findings. The therapist, alarmed by the entries and believing they triggered her duties as a mandatory reporter, informed the Sherwood Police Department ("Sherwood Police") about the list. The therapist told Mrs. McNeil to call a local crisis hotline, which she did. The hotline's social worker also contacted the Sherwood Police about CLM's list.

Later that day, the Sherwood Police searched the McNeils' residence. Officers found and confiscated several weapons, including a .22 caliber rifle and 525 rounds of ammunition belonging to CLM, but the officers found

nothing "to indicate any planning had gone into following through with the hit list."

Shortly after the search, CLM and his parents voluntarily went to the police station, where they provided the police with a copy of CLM's hit list. After being read his *Miranda* warnings, CLM admitted he created the hit list and that "sometimes he thinks killing people might relieve some of the stress he feels," but he also stated "he uses the journal to vent" and that "he would never carry out" such thoughts. CLM claimed he created the list about four months prior to its discovery. The Sherwood Police determined that no criminal charges would be brought against CLM at that time.

Meanwhile, the Sherwood Police informed the School District of CLM's hit list, of the fact the police had seized guns from his house, and that CLM's journal contained additional entries that graphically depicted school violence. Sherwood High's principal, Ken Bell, was aware that the McNeils lived "very close" to Sherwood High and assembled an administrative team to address the issue.

Consistent with the notification requirements of Oregon Revised Statutes § 339.327(1), the School District's policies required school faculty to notify the parents of students found on a hit list within 12 hours of discovery. Within the 12-hour span, Bell's team made the necessary calls, which did not identify CLM as the hit list's author. Before the final call was made, the media began contacting the School District to inquire about the list. The School District also learned that CLM's picture had been posted on social media accounts. Upon realization of the widespread knowledge regarding CLM's hit list, Bell's team sent out a recorded voice message to all parents of students in the School District to notify them

of the issue. The message stated that a student of Sherwood High had authored a hit list containing 23 names, but that the list contained no specific threats and the home in which the student resided was safe. The School District also issued a press release containing similar information. Thereafter, Sherwood High received numerous calls and emails from parents, media outlets, and the public requesting information about the hit list, CLM's identity, and whether CLM posed a threat to others. Some parents demanded to meet with Bell, and other parents had their children leave school early, miss several days, or transfer out of the district. A student was caught on campus with a knife, and he alleged "he needed it to protect himself in light of the hit list."

The School District suspended CLM pending an expulsion hearing. Bell recommended that CLM be expelled from Sherwood High for one year because news of his hit list "significantly disrupted the learning environment at school," which would only be increased by CLM's return. Sherwood High's associate principal wrote a letter to the McNeils stating that he recommended that CLM be expelled for one year for making "a threat of violence" that "has caused a distinct and substantial disruption to the school environment."

On September 22, 2014, an expulsion hearing was held before Pete Miller, a hearings officer for the School District. CLM was represented by an attorney at the hearing. Upon review of the testimony and evidence, Miller adopted the principal's recommendation for expulsion, largely based on "the significant disruption" CLM's list caused in the school environment. After the hearing, the School District's associate superintendent sent a decision letter to the McNeils, explaining that the list constituted "a threat of violence in violation of the Student Code of Conduct." The letter

explained that CLM could not return to school that academic year, and that the McNeils had the right to appeal the decision to the School District's board.  The McNeils did not appeal.

Following his expulsion, CLM received alternative forms of education through the School District, including online courses, in-person tutoring, and courses at a community college.  However, CLM had "no immediate or even daily access to instructors," and the tutors were "inconsistent and not dependable," as they missed appointments and in one instance failed to follow up for weeks.  CLM ultimately had to retake several classes.

In June 2015, CLM and the McNeils filed a complaint in the U.S. District Court for the District of Oregon seeking damages and other relief under 42 U.S.C. § 1983.  CLM sought damages for the School District's alleged violations of the Free Speech Clause of the First Amendment and of the Equal Protection and Due Process Clauses of the Fourteenth Amendment.[1]  The McNeils also brought a substantive due process challenge to CLM's expulsion.  The complaint sought expungement of any documentation or reference to CLM's suspension, expulsion, and the circumstances surrounding the disciplinary proceedings.

The School District moved for summary judgment on all claims, while CLM and the McNeils moved for summary judgment on their free speech claim and substantive due process claim, respectively.  The district court concluded that the School District could regulate CLM's off-campus speech for three primary reasons: (1) the hit list had a sufficient

---

[1]    On appeal, CLM has withdrawn his equal protection and procedural due process claims.

connection to Sherwood High; (2) school officials could have reasonably foreseen that the effects of the hit list would spill over into the school environment; and (3) the facts in CLM's case mirrored those in *Wynar v. Douglas County School District*, 728 F.3d 1062 (9th Cir. 2013). The district court further held that the one-year expulsion did not violate CLM's First Amendment rights, reasoning that a student-authored hit list would cause a substantial disruption in any school community, particularly in light of Oregon's statutory notification requirement.

The district court also granted the School District summary judgment on the McNeils' substantive due process claim. The district court reasoned that the claim failed because it was derivative of CLM's First Amendment claim and because a school has the authority to discipline students on reasonable grounds. The district court determined that although the McNeils had a liberty interest in an "initial 'educational venue choice,'" their interest did not extend to temporary school discipline within that venue, which is an issue "generally committed to the control of the state and local authorities."

Appellants timely appealed. On appeal, CLM claims that the School District lacked authority under the First Amendment to discipline CLM for his hit list. The McNeils also allege that the School District's expulsion of CLM violated their substantive due process right "to be free from state interference with their choice of [CLM's] educational forum."

## II.

We review "the district court's grant of summary judgment *de novo.*" *Szajer v. City of Los Angeles*, 632 F.3d 607, 610 (9th Cir. 2011). The court views "evidence in the light most favorable to the nonmoving party," to determine "whether genuine issues of material fact exist." *George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014) (quoting *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996)). If a rational juror "'could resolve a genuine issue of material fact in the nonmoving party's favor,' summary judgment is inappropriate." *Id.* (quoting *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011)).

## III.

"The first inquiry in any § 1983 suit . . . is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" *Baker v. McCollan*, 443 U.S. 137, 140 (1979). Section 1983 does not create substantive rights, but rather provides the procedural mechanism for vindicating federal statutory or constitutional rights. *Id.* at 145 n.3.

### A.  CLM's First Amendment Claim

The Supreme Court has held that public school students do not forfeit "their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cnty. Sch. Dist.*, 393 U.S. 503, 506 (1969). However, their rights are "not automatically coextensive with the rights of adults in other settings." *Wynar*, 728 F.3d at 1067 (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986)). Additionally, although they enjoy greater freedom to speak when they are off campus than when they are on

campus, their off-campus speech is not necessarily beyond the reach of a school district's regulatory authority. Our review of the School District's treatment of CLM turns on two inquiries: (1) whether the School District could permissibly regulate CLM's off-campus speech at all; and if so, (2) whether the School District's decision to expel CLM violated the First Amendment standard for school regulation of speech set out in *Tinker*. *See C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1148 (9th Cir. 2016).

1. *The School District's authority to regulate CLM's off-campus speech*

We have twice considered the authority of a school district to regulate off-campus speech. In *Wynar*, a high school student was expelled because he sent graphic instant messages to his friends from his home computer. 728 F.3d at 1064–67. The messages expressed threats of school violence and indicated that the student had access to guns and ammunition. *Id*. at 1065–66. The messages were brought to the school's attention by the student's friends. *Id*. at 1066. Despite the student's lack of intent in bringing his speech to the school campus, we held that his expulsion was constitutional, reasoning that "when faced with an identifiable threat of school violence, schools may take disciplinary action in response to off-campus speech . . . ." *Id*. at 1069.

In *C.R.*, a school district suspended a student for sexually harassing two students shortly after school hours in a public park near the school. 835 F.3d at 1145–47. The student argued that the school's regulation of his harassment was unconstitutional because the harassment occurred in a public, off-campus park. *Id*. at 1145–46. While we recognized that the harassment constituted off-campus speech, we held that

the suspension was constitutional.  *Id*. at 1146.  We reasoned that the speech was closely tied to the school, noting that all of the individuals involved were students and that the incident occurred in close proximity to the school and just minutes after the end of the school day.  *Id*. at 1150–51.  We also noted that school administrators could reasonably expect the effects of the speech to disrupt the school environment.  *Id*. at 1151.

Although our previous cases have not settled on a test for determining when a school can constitutionally regulate off-campus speech, we have stressed the importance of flexibility in dealing with the "myriad of circumstances" schools face.  *Wynar*, 728 F.3d at 1069; *see also C.R.*, 835 F.3d at 1150–51.  These cases have noted two approaches: (1) requiring that off-campus speech "have a sufficient 'nexus' to the school," *Wynar*, 728 F.3d at 1068 (quoting *Kowalski v. Berkeley Cty. Schs.*, 652 F.3d 565, 573 (4th Cir. 2011)); and (2) requiring "that it be 'reasonably foreseeable that the speech will reach the school community,'" *id.* (quoting *S.J.W. v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 777 (8th Cir. 2012)).

We now clarify that courts considering whether a school district may constitutionally regulate off-campus speech must determine, based on the totality of the circumstances, whether the speech bears a sufficient nexus to the school.  *See C.R.*, 835 F.3d at 1150–51; *Wynar*, 728 F.3d at 1069.  This test is flexible and fact-specific, but the relevant considerations will include (1) the degree and likelihood of harm to the school caused or augured by the speech, *see Wynar*, 728 F.3d at 1069, (2) whether it was reasonably foreseeable that the speech would reach and impact the school, *see C.R.*, 835 F.3d at 1150–51; *Wynar*, 728 F.3d at 1069; *Kowalski*, 652 F.3d at 573, and (3) the relation between the content and context of

the speech and the school, *see C.R.*, 835 F.3d at 1150–51; *Wynar*, 728 F.3d at 1069.[2]  There is always a sufficient nexus between the speech and the school when the school district reasonably concludes that it faces a credible, identifiable threat of school violence.  See *Wynar*, 728 F.3d at 1069.

CLM attempts to distinguish *Wynar* on the ground that he had no intent to communicate the contents of his speech to anyone.  That distinction cannot be dispositive.  We have recognized repeatedly that the specter of school violence places a weighty social responsibility on school districts to ensure that "warning signs" do not turn to tragedy.  *See LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 987 (9th Cir. 2001).  This responsibility does not mean schools may "expel students just because they are 'loners,' wear black and play video games."  *Id.*  It does mean, however, that a student's intent, although relevant, does not necessarily define the threat of violence.  We reaffirm our holding in *Wynar* that regardless of the speaker's intent or how speech comes to a school district's attention, a school district may take disciplinary action in response to off-campus speech when it reasonably determines that it faces an identifiable and credible threat of school violence.  *See Wynar*, 728 F.3d at 1069.

Of course, any information school officials have regarding the intention of the speaker may bear on whether a threat is credible.  The intent to keep a threat private,

---

[2]     In analyzing foreseeability, we have considered both whether it was foreseeable to the speaker that the speech would reach the school, *see Wynar*, 728 F.3d at 1068, and whether it was foreseeable to school administrators that the speech would impact the school community, *see C.R.*, 835 F.3d at 1151.

however, is not determinative—it would be absurd to suggest that secret threats or planning cannot give rise to reasonable concerns of school violence. *See, e.g.*, Kristin McCauley, Arapahoe Cty. Sheriff, *Investigative Report: Arapahoe High School Case # CT13-44545*, at 29–31 (2014), https://mediaassets.thedenverchannel.com/document/2014/10/10/AHSShootingReport_8903184_ver1.0.pdf?_ga=2.155919036.684175427.1543265365-980564543.1543265365 (describing password-protected diary entries containing planning for a fatal 2013 school shooting).

Here, the School District reasonably determined CLM presented a credible threat. The School District knew CLM had identified specific targets, had accentuated his hit list with the phrases "I am *God*" and "All These People *Must* Die," lived in a gun-owning home close to the school, and had had thoughts of suicide. The School District also knew the diary contained other graphic depictions of school violence. This evidence was sufficient to render the School District's determination reasonable and to give it authority to regulate CLM's speech.

CLM argues that, once he was in police custody, he ceased to pose a safety threat because he was being evaluated in the care of competent authorities. This evaluation, however, lasted only one day, and afterward CLM returned home with limited oversight and his parents retrieved the family's firearms. The police's decision to release CLM cannot prevent the school from addressing the threat of violence: a school may take action even where police or mental health professionals have elected not to do so. *See LaVine*, 257 F.3d at 990 ("It is true that the [police and a psychiatrist] did not believe [the student at issue] should be involuntarily committed, but the standard for involuntary

commitment is not the same as that for school officials to take action."). Schools must be permitted to act preventatively, taking into account other students' interest in a safe school environment. Here, the school reasonably determined the risk was sufficient to take action.

Our test does not allow a school to take disciplinary action in response to just any perceived threat of school violence arising from off-campus speech. Although our review of a school's determinations in this regard is deferential, "deference does not mean abdication; there are situations where school officials overstep their bounds and violate the Constitution." *Id.* at 988.

In *Porter v. Ascension Parish School Board*, 393 F.3d 608 (5th Cir. 2004), for example, Adam, a high school student, depicted a military attack on his school in his sketchpad. *Id*. at 611. There were no students identified in the drawing and Adam stored the sketchpad in his closet at home. *Id*. Two years later, Adam's brother brought the sketchpad to the school. *Id*. Another student, with permission from Adam's brother, flipped through the sketchpad and, upon coming across Adam's drawing of the military attack, exclaimed, "they're going to blow up [the school]." *Id*. This brought the drawing to the attention of school authorities, who expelled Adam for the drawing. *Id*. at 611–12. The Fifth Circuit held that Adam's drawing was protected by the First Amendment because it did not constitute "speech on campus or even speech directed at the campus." *Id*. at 615. The Fifth Circuit noted that for Adam's drawing to lose First Amendment protection, something more than "accidental and unintentional exposure to public scrutiny must take place." *Id*. at 618. The Fifth Circuit reasoned that because Adam's

drawing was not intentionally communicated, it was not a true threat and therefore not subject to school regulation. *Id*.

We do not adopt the Fifth Circuit's reasoning, but note that our approach supports the result in *Porter* and that there are critical distinctions between the facts here and those in *Porter*.   There, the drawing was two years old, highly fantastical, unspecific, and unaccompanied by other indicia of a violent intent.  *See id.* at 611.  There was no evidence Adam had ever had the capacity to carry out the actions depicted in the drawing.  In contrast to this case, it was unlikely that any reasonable administrator could have believed the school faced a credible safety threat.

Taken as a whole, the three considerations that guide application of the nexus test support the School District here. First, it was reasonable for School District officials to conclude that CLM presented a credible threat of severe harm to the school community.  This consideration establishes a sufficient nexus between the speech and the school to permit regulation. *See Wynar*, 728 F.3d at 1069.

Second, once it learned of the hit list, the School District could reasonably foresee that news of the threat would reach and impact the school and disrupt the school environment. Oregon's notification requirement, Oregon Revised Statutes § 339.327(1), provides that "[a] superintendent of a school district . . . who has reasonable cause to believe that a person, while in a school, is or has been in possession of a list that threatens harm to other persons" must notify the "parent or guardian of any student whose name appears on the list as a target of the harm."  The statute applies to enrolled students who are or *have been* in possession of a threatening list, regardless of whether the list is on or off school property.  It

was reasonably foreseeable that parents, once notified as required by Oregon law, would inform their children about the hit list. It was also reasonably foreseeable that information about the hit list would cause students to be fearful for their safety. Invariably, these resulting consequences would create classroom distractions and substantial disruptions within the Sherwood High community. Although it was not foreseeable *to CLM* that his speech would reach the school, a lack of intent to share speech is of minimal weight when, as here, the speech contains a credible threat of violence directed at the school. Someone planning a violent act does not need to advertise it.

Third, the content of the speech involved the school. As we noted in *Wynar* and *C.R.*, when all involved parties are students, that fact "typically counsels in favor of finding that a student's speech was susceptible to discipline." *C.R.*, 835 F.3d at 1150 (citing *Wynar*, 728 F.3d at 1069). Here, CLM's hit list contained the names of 22 students and one former teacher of the School District, and thus, presented a particular threat to the school community. Ordinarily, schools may not discipline students for the contents of their private, off-campus diary entries, any more than they can punish students for their private thoughts, but schools have a right, indeed an obligation, to address a credible threat of violence involving the school community.

In sum, we conclude that the School District could regulate CLM's off-campus speech without violating his First Amendment rights. Although CLM may not have foreseen his speech reaching Sherwood High, the School District, when informed of CLM's hit list, reasonably determined that it faced a credible, identifiable threat of school violence. The speech bore a sufficient nexus to the school. Accordingly, the

School District could take disciplinary action consistent with *Tinker*.

2. *The School District's expulsion of CLM*

Although some disciplinary action was permissible, there remains the issue of whether the School District's expulsion was consistent with the First Amendment. "Under *Tinker*, schools may restrict speech that 'might reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities' or that collides 'with the rights of other students to be secure and to be let alone.'" *Wynar*, 728 F.3d at 1070 (alteration in original) (quoting *Tinker*, 393 U.S. at 508, 514). This analysis considers not just the actions of the disciplined student, but rather "all of the circumstances confronting the school officials that might reasonably portend disruption." *LaVine*, 257 F.3d at 989. We have held that "the specter of a school shooting qualifies under either prong of *Tinker*." *Wynar*, 728 F.3d at 1070. School districts should be afforded deference in determining what discipline is necessary to maintain safety and order, *see id.* at 1072, but we have cautioned that discipline can extend beyond the scope *Tinker* allows when it takes on a purely punitive character, *see LaVine*, 257 F.3d at 992.

Here, taking disciplinary action was reasonable under both *Tinker* prongs. As discussed, CLM's hit list identifying specific individuals constituted a credible threat of school violence that required the School District to act in furtherance of the safety of its students. Oregon's statutory notification requirement further confirms this proposition, as the School District could reasonably foresee that informing parents that their children were identified on a student-authored hit list

would cause a substantial disruption within the Sherwood High community. Moreover, CLM's hit list led to a material disruption at Sherwood High by causing safety concerns among both students and parents. The record evinces this disruption by the outcry from parents who demanded to speak with Sherwood High authorities and by the parents who transferred or threatened to transfer their child out of the School District. Thus, in light of the nature of CLM's hit list and the widespread knowledge regarding the list in the Sherwood High community, it was reasonable for School District officials to forecast that CLM's presence at the school would cause a substantial disruption.

Moreover, CLM's hit list also invaded the "rights of other students to be secure and to be let alone." *Tinker*, 393 U.S. at 508. As *Wynar* stated, a student "target[ing] specific students by name" for a potential school shooting "represent[s] the quintessential harm to the rights of other students to be secure." 728 F.3d at 1072.

On appeal, CLM does not challenge the length of his expulsion—he argues only that the School District did not have the authority to expel him at all. We thus are not called upon to determine whether a one-year expulsion was excessive. At a certain point, discipline may lose its basis in reasonable, ongoing concerns of campus safety, disruption, or interference with the rights of other students, and instead become primarily a punitive, retrospective response to the student's speech. Such discipline would be in conflict with *Tinker*. *See LaVine*, 257 F.3d at 991–92. Here, however, we decide only that CLM has not shown that the decision to expel him violates his constitutional rights under *Tinker*. The School District could reasonably conclude that CLM's continued presence at the school at the time of his expulsion

would have caused a "substantial disruption of, or material interference with school activities" and would have interfered "with the rights of other students to be secure and to be let alone." *Wynar*, 728 F.3d at 1070 (quoting *Tinker*, 393 U.S. at 508, 514).

### B.  The McNeils' Substantive Due Process Claim

Finally, we address the McNeils' substantive due process claim.  The Fourteenth Amendment's Substantive Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests," such as a parent's right to make decisions regarding the "care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).  One such fundamental right is "the right of parents to be free from state interference with their choice of the educational forum itself, a choice that ordinarily determines the type of education one's child will receive." *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1207 (9th Cir. 2005).  However, once parents determine their child's educational forum, their fundamental right to control the education is "substantially diminished." *Id*. at 1206.  Due process does not give parents the right to interfere with a public school's operations because issues such as school discipline, the content of examinations, and dress code are "issues of public education generally 'committed to the control of state and local authorities.'" *Id*. (quoting *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395–96 (6th Cir. 2005)).

Here, the School District did not deprive the McNeils of their liberty interest in determining where CLM completes his high school education or whether CLM attends public school.

The McNeils' fundamental right allowed them to voluntarily enroll CLM at Sherwood High.  In doing so, they accepted Sherwood High's curriculum, school policies, and reasonable disciplinary measures.

## IV.

The number of reported tragic school shootings over the past two decades emphasizes the need for school districts to have the authority to take disciplinary action when faced with a credible threat of school violence.  *See Wynar*, 728 F.3d at 1069.  Although a student's expectation as to the circulation of his speech may be relevant to an evaluation of whether the speech constitutes a credible threat, the student's intent as to circulation does not condition the school's regulation of threatening off-campus speech.  As we noted in *Wynar*, "[w]e can only imagine what would have happened if the school officials, after learning of [the] writing, did nothing about it," and CLM did in fact come to Sherwood High with a firearm and the intent to carry out his hit list.   728 F.3d at 1070 (alterations in original) (quoting *Boim v. Fulton Cty. Sch. Dist.*, 494 F.3d 978, 984 (11th Cir. 2007)).

We hold that the School District's decision to discipline CLM for his off-campus speech did not violate CLM's constitutional right to free speech.  A student's lack of intent to convey his off-campus speech to any third party is relevant to an evaluation of whether the speech constitutes a credible threat, but is not dispositive.  Rather, a court must consider all the relevant factual circumstances when determining whether a school's regulation of a student's off-campus speech is constitutional.  Here, CLM's lack of intent to communicate the contents of his hit list is offset by the fact that his speech created a credible, identifiable threat of school violence.

The McNeils' substantive due process claim also fails because their fundamental right to choose CLM's educational forum was not infringed by the School District's discipline of CLM.

The district court's judgment for Defendants is **AFFIRMED.**