**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CALIFORNIA PARENTS FOR THE EQUALIZATION OF EDUCATIONAL MATERIALS; ARVIND RAGHAVAN, individually and as parent and next friend of M.R. and N.R.; VISHNUKUMAR THUMATI, individually and as parent and next friend of P.T. and N.T.; SHAILESH SHILWANT, individually and as parent and next friend of P.S. and P.S.S.,

*Plaintiffs-Appellants*,

v.

TOM TORLAKSON, in his official capacity as State Superintendent of Public Instruction and Director of Education for the California Department of Education; TOM ADAMS, in his official capacity as Deputy Superintendent of the Instruction and Learning Support Branch of the California Department of Education; STEPHANIE GREGSON, in her official capacity as Director of the Curriculum Frameworks and Instructional Resources Division of the California Department of

No. 19-15607

D.C. No. 3:17-cv-00635-CRB

OPINION

Education; MICHAEL KIRST; ILENE STRAUS; SUE BURR; BRUCE HOLADAY; FELIZA I. ORTIZ-LICON; PATRICIA ANN RUCKER; NICOLASA SANDOVAL; TING L. SUN; TRISH BOYD WILLIAMS, each in their official capacity as a member of the California State Board of Education; MYONG LEIGH, in his official capacity as Interim Superintendent of the San Francisco Unified School District; SHAMANN WALTON; HYDRA MENDOZA-MCDONNELL; STEVON COOK; MATT HANEY; EMILY M. MURASE; RACHEL NORTON; MARK SANCHEZ, each in their official capacity as a member of the San Francisco Unified School District; RICK SCHMITT, in his official capacity as Superintendent of the San Ramon Valley Unified School District; MARK JEWETT; KEN MINTZ; RACHEL HURD; DENISE JENNISON; GREG MARVEL, each in their official capacity as a member of the San Ramon Valley Unified School District Board of Education; WENDY GUDALEWICZ, in her official capacity as Superintendent of the Cupertino Union School District; ANJALI KAUSAR; LIANG CHAO; KRISTEN LYN; SOMA MCCANDLESS; PHYLLIS VOGEL, each in their

official capacity as a member of the Cupertino Union School District Board of Education; CHERYL JORDAN, in her official capacity as Superintendent of the Milpitas Unified School District; DANIEL BOBAY; DANNY LAU; CHRIS NORWOOD; HON LIEN; ROBERT JUNG, each in their official capacity as a member of the Milpitas Unified School District Board of Education,
*Defendants-Appellees*,

REGENTS OF THE UNIVERSITY OF CALIFORNIA,
*Intervenor.*

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted July 14, 2020
San Francisco, California

Filed September 3, 2020

Before: Sidney R. Thomas, Chief Judge, and Mary M.
Schroeder and Daniel A. Bress, Circuit Judges.

Opinion by Judge Schroeder;
Concurrence by Judge Bress

# SUMMARY[*]

## Civil Rights

The panel affirmed the district court's dismissal of all but one of plaintiffs' claims and its summary judgment in favor of defendants on the remaining claim in an action brought by parents of Hindu children in the California public schools who alleged discrimination against the Hindu religion in the content of the History-Social Science Standards and Framework for sixth and seventh graders.

The complaint focused on a handful of provisions in the 1998 Standards and the 2016 Framework and alleged these curriculum materials carried a hostile and denigrating message about the origins of Hinduism when compared with similar provisions relating to other religions of the world.

Addressing Appellants' Equal Protection claims that the Standards and Framework discriminate against Hinduism, the panel held that the district court correctly characterized the challenge as an indirect attack on curricula. The panel determined that the allegations in the complaint contained no reference to State Board policy, nor did the allegations describe any materials used in the classroom from which such a policy could be inferred. Citing *Monteiro v. Tempe Union School District*, 158 F.3d 1022 (9th Cir. 1998), the panel noted that, at least absent evidence of unlawful intentional discrimination, parents are not entitled to bring Equal Protection claims challenging curriculum content.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Addressing Appellants' claims under the Free Exercise clause of the First Amendment, the panel held that the complaint did not allege interference with Appellants' exercise of their religion under the Constitution as required for a viable Free Exercise claim under *Trinity Lutheran Church v. Comer*, 137 S. Ct. 2012 (2017), and *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246, 2252 (2020). The panel held that offensive content that does not penalize, interfere with, or otherwise burden religious exercise does not violate Free Exercise rights.

Addressing the Fourteenth Amendment substantive due process claim, the panel held that, with respect to education, parents have the right to choose the educational forum, but not what takes place inside the school. Parents therefore do not have a due process right to interfere with the curriculum, discipline, hours of instruction, or the nature of any other curricular or extracurricular activities.

Finally, addressing the First Amendment Establishment clause claims, the panel held that the district court did not abuse its discretion by excluding an expert report offered by plaintiffs to explain how, from the perspective of a person knowledgeable in the field of religious history, the Standards and Framework express a negative view of Hinduism. The panel held that it must evaluate the Standards and Framework from the perspective of an objective, reasonable observer, and not that of an academic who is an expert in the field. The panel concluded that the Standards and Framework did not call for the teaching of biblical events or figures as historical fact, thereby implicitly endorsing Judaism, Christianity, and Islam. The panel further concluded that none of Appellants' characterizations of the Hinduism materials as disparaging was supported by an objective reading of those materials.

Concurring, Judge Bress stated that the majority opinion correctly held that there was no basis in this record to conclude that the defendants discriminated against Hinduism. The majority also properly rejected the plaintiffs' Establishment Clause challenge. Judge Bress noted that some portions of the majority opinion discussing plaintiffs' Establishment Clause claim drew upon Ninth Circuit precedent that was based on *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and that the list of situations in which the Supreme Court has effectively repudiated the *Lemon* test, either by expressly declining to apply the test or simply ignoring it, has grown quite long. Judge Bress nevertheless stated that regardless, whether under a *Lemon*-based test or an Establishment Clause analysis more appropriately grounded in the history and traditions of this country, there was no establishment of religion here.

---

### COUNSEL

Glenn Katon (argued), Katon Law, Oakland, California, for Plaintiffs-Appellants.

Thomas H. Prouty (argued), Deputy General Counsel; Todd M. Smith, Assistant General Counsel; Keith Yamanaka, General Counsel; California Department of Education, Sacramento, California; for Defendants-Appellees.

---

**OPINION**

SCHROEDER, Circuit Judge:

Parents of Hindu children in the California public schools filed suit against the State Department of Education and State Board of Education claiming discrimination against the Hindu religion in the content of the History-Social Science Standards and Framework for sixth and seventh graders. Appellants are individual parents and the organization California Parents for the Equalization of Educational Materials (CAPEEM). They alleged violations of several constitutional provisions including Due Process, Equal Protection, and the Establishment and Free Exercise clauses of the First Amendment.

Their complaint focuses on a handful of provisions in the 1998 Standards and the 2016 Framework and alleges these curriculum materials carry a hostile and denigrating message about the origins of Hinduism when compared with similar provisions relating to other religions of the world. Of particular concern is the passage in the Standards concerning the role of invaders, and their effect on the origins of Hinduism. Plaintiffs allege that this theory has been discredited and disparages their religion.

The district court dismissed all but one of the claims and then granted summary judgment in favor of Appellees on the remaining Establishment clause claim, holding that the Standards and Framework do not communicate disapproval of Hinduism. The court also excluded an expert report offered by Appellants to explain how, from the perspective of a person knowledgeable in the field of religious history, the Standards and Framework express a negative view of

Hinduism. The court ruled that the question was how curriculum materials would be understood by a reasonable observer, not how an expert would interpret them. We affirm.

# I. BACKGROUND

## A. California Content Standards, The Curriculum Framework, And Their Relevant Provisions

The California State Board of Education (State Board) develops model curriculum outlines to provide standardized guidance to individual school districts. These outlines, known as Content Standards and Curriculum Frameworks, are used by individual school districts to design more tailored course curricula. *See* Cal. Educ. Code § 60000(b). The State Board first issues Content Standards, which are broad guidelines for each major subject area, such as history and math. *See* Cal. Educ. Code §§ 60602.5(a)(1), 60605, 60618. The State Board then issues Curriculum Frameworks which fill in more detail lacking in each of the Standards. *See* Cal. Educ. Code §§ 60000, 60005, 60200(c). The local school districts in California decide the precise contours of what is taught in their public school classrooms, and can supplement the materials or omit content contained in them. *See* Cal. Educ. Code § 60000(b).

The State Board, in 1998, adopted the Content Standards for history and social science that Appellants challenge in this lawsuit. In just a few pages, the Content Standards outline the history of the world's first major civilizations and religions, and invite sixth grade students to engage in critical analysis of the "geographic, political, economic, religious,

and social structures" of each civilization, including Ancient India.

The State Board then adopted the Curriculum Framework for history and social science in 2016 after a lengthy comment process that solicited feedback from the public. Like the Content Standards, the Curriculum Framework calls for students to analyze ancient civilizations from a social science perspective, with materials to include, among other subject matter, "the birth and spread of religious and philosophical systems." The Curriculum Framework provides the additional detail and context lacking in the Content Standards.

## B.  Plaintiffs And Challenged Provisions

Appellants here are a non-profit organization, CAPEEM, and three parents on behalf of themselves and their children enrolled in California's public school system. CAPEEM is a membership organization that exists to promote fair and accurate depictions of Hinduism in the public school system.

This is not the first time that CAPEEM has challenged the constitutionality of information about Hinduism provided to public school students. In 2006, CAPEEM filed a lawsuit claiming that California's recently adopted text books had content that was anti-Hindu, and that the use of such text books violated the Establishment clause. The district court in that case determined that the text books did not contain any information that disparaged Hinduism, and granted summary judgment to the state. *Cal. Parents for Equalization of Educ. Materials v. Noonan*, 600 F. Supp. 2d 1088, 1119 (E.D. Cal. 2009). CAPEEM did not appeal. In this case, Appellants, instead of challenging text books, challenge certain aspects of

the descriptions of Hinduism in the 1998 Standards and 2016 Framework.

Appellants first assert that the Standards and Framework do not describe the divine origins of Hinduism or discuss the sacred texts of their religion, while, at the same time, describing the divine origins of the other major religions. As an example, they point to language in the Standards that describes Hinduism as consisting of "beliefs and practices," and they point as well to a characterization of one of Hinduism's sacred texts, the Bhagavad Gita, as an important piece of literature in Ancient India. Appellants additionally highlight a phrase in the Framework that describes Hinduism as a "culture that emerged as a belief system." They argue that these are secular descriptions of Hinduism that are disparaging when read alongside the descriptions of other religions covered by the education materials.

Appellants object as well to the Standards' instruction directing the students to "[d]iscuss the significance of the Aryan Invasions." Appellants assert that this instruction references a now-debunked theory that invaders from the north entered ancient India, leading to the creation of Hinduism.

Also causing Appellants concern is the Framework's description of the caste system in Ancient India; in particular, Appellants object to the description of caste as a religious belief. Appellants point to a passage in the Framework, which says that "Teachers should make clear to students that [caste] was a social and cultural structure as well as a religious belief." Appellants argue that the association with the caste system singles out Hinduism for negative treatment

when compared with the other religions discussed in the Standards and Framework.

These three objections form the basis of most of Appellants' constitutional claims.

### C. The Complaint

Appellants filed their complaint in 2017. It alleges that the content of the Standards and Framework, and the process leading up to the Framework's adoption, violate several provisions of the constitution.

The complaint includes two Equal Protection claims. The first is that the content of the Standards and Framework describes Hinduism in derogatory terms and from the perspective of a skeptic, whereas the same material describes other religions with respect. Appellants also allege that the Department of Education violated their Equal Protection rights when it refused to accept all of CAPEEM's proposed edits to the Framework, while at the same time, accepting edits from other religious groups during the notice and comment process.

With respect to the Free Exercise clause, the complaint alleges that the content of the challenged provisions of the Standards and Framework denigrates Hinduism and is therefore not neutral with respect to religion and violative of their rights to free exercise. As with their Equal Protection claims, Appellants also assert that occurrences in the process leading up to the Framework's adoption violated their Free Exercise rights.

Bias against Hinduism in the content of the Standards and Framework is the basis for the alleged substantive due process violation as well. The complaint alleges that the Standards and Framework "indoctrinate children with beliefs biased deeply against Hinduism and in favor of the Abrahamic religions," and thereby interfere with the liberty interests of the parent Appellants to control the upbringing and education of their children.

Finally, the complaint contains two Establishment clause claims. It alleges that the content of the Standards and Framework unconstitutionally endorse Judaism, Christianity, and Islam, because the content calls for the teaching of religious events, significant to those religions, as historical fact. The complaint then alleges in the second Establishment clause claim that the content of the challenged materials has the primary effect of disparaging or denigrating Hinduism.

All of Appellants' constitutional claims thus relate to the particular passages in the Standards and Framework that they find objectionable. None challenge the Department of Education's overall policy of providing students with an introduction to the major world religions and none relate to material students actually see in the classroom.

## D. The District Court's Decisions

The district court in a published opinion in 2017 dismissed all of Appellants' claims, with the exception of the Establishment clause claim relating to disparagement of Hinduism. *Cal. Parents for Equalization of Educ. Materials v. Torlakson*, 267 F. Supp. 3d 1218 (N.D. Cal. 2017). The district court later, also in a published opinion, granted summary judgment to the State Board on that claim. *See Cal.*

*Parents for Equalization of Education Materials v. Tolarkson*, 370 F. Supp. 3d 1057, 1067–1083 (N.D. Cal. 2019).

In its first opinion dismissing most of CAPEEM's claims, including the Equal Protection claims, the district court extensively examined our circuit's leading case on Equal Protection challenges to educational materials, *Monteiro v. Tempe Union School District*, 158 F.3d 1022 (9th Cir. 1998). In that case, Kathy Monteiro brought suit on behalf of her daughter, and argued that the curriculum's inclusion of literary works containing racially derogatory terms, such as *The Adventures of Huckleberry Finn* and *A Rose For Emily*, violated their Equal Protection rights. *Id*. at 1024–25. Our opinion in *Monteiro* held that objections to curriculum assignments cannot form the basis of a viable Equal Protection claim, because curriculum decisions must remain the province of school authorities. Absent an allegation of an underlying racist policy, plaintiffs cannot challenge "the assignment of material deemed to have educational value by school authorities." *Id*. 1031–32.

We explained that permitting such Equal Protection challenges would infringe on other students' First Amendment interests in reading the contested materials. *Id*. at 1028. We saw the role of the school district in selecting curricula to be equally important. Permitting such challenges would "significantly interfere with the [school district]'s discretion to determine the composition of its curriculum." *Id*. at 1029. We observed that the desire to avoid such lawsuits could "lead many school districts to 'buy their peace' by avoiding the books or other materials that express messages . . . that could be argued to cause harm to a group of students." *Id*. In other words, permitting Equal Protection

claims seeking removal of works from curriculum would have a significant chilling effect on the types of materials assigned by our public schools. *Id.* This would, in turn, damage the quality of public education offered to students. "[T]he function of . . . education itself is to stimulate thought, to explore ideas, to engender intellectual exchanges. Bad ideas should be countered with good ones, not banned by the courts." *Id.* at 1032. We therefore held that the Equal Protection clause is not a vehicle for challenging curriculum content choices.

The district court in this case concluded that the reasoning of *Monteiro* with respect to curricula applied equally to the materials challenged here that provide the general outlines for curriculum content. Following *Monteiro*, the district court ruled that Appellants' objections to the content of the Standards and Framework did not state a plausible Equal Protection claim. *Cal. Parents for Equalization of Educ. Materials*, 267 F. Supp. 3d at 1232; *see also Noonan*, 600 F. Supp. 2d at 1111 (holding that CAPEEM's challenges to public school text books were barred by *Monteiro*). The court also concluded that Appellants' indirect challenge to the content, through allegations of differential treatment in the Framework adoption process, was necessarily barred. *Cal. Parents for Equalization of Educ. Materials*, 267 F. Supp. 3d at 1234–35. Those allegations faulted the State Board's rejection of Appellants' proposed amendments to the Framework during the comment process, and acceptance of suggested edits of another group Appellants deemed hostile to Hinduism. The district court reasoned that it would render our decision in *Monteiro* meaningless if plaintiffs could make out an Equal Protection claim when a state official refuses to adopt plaintiffs' content preferences during the comment process. *Id.* Constitutional challenges to the content of

curricula on religious grounds must be adjudicated under the religion clauses of the First Amendment, not Equal Protection. *Id*. at 1235.

The district court also ruled that Appellants had failed to allege a plausible Free Exercise claim, because our case law requires Appellants to allege a substantial burden on their religious practice or exercise. *Id*. at 1226–27 (citing and discussing *Am. Fam. Ass'n Inc. v. City & Cnty. of S.F.*, 277 F.3d 1114, 1123–24 (9th Cir. 2002)). In *American Family*, we rejected the argument that the Supreme Court had eliminated the need for plaintiffs to allege a substantial burden on their religious exercise where, as here, no law or other regulatory government conduct is involved. *Am. Fam. Ass'n Inc*., 277 F.3d at 1123–24. Dismissal of the complaint in *American Family* was appropriate because "the complaint did not . . . allege any specific religious conduct that was affected by the Defendants' actions." *Id*. Finding no such allegation in this case, the district court dismissed Appellants' Free Exercise clause claims. *Cal. Parents for Equalization of Educ. Materials*, 267 F. Supp. 3d at 1227.

The district court additionally held that under our decision in *Fields v. Palmdale School District*, 427 F.3d 1197 (9th Cir. 2005), it was required to dismiss Plaintiffs' substantive due process claims. *Cal. Parents for Equalization of Educ. Materials*, 267 F. Supp. 3d at 1224. In *Fields*, we explained that, under cases going back to *Meyer v. Nebraska*, 262 U.S. 390 (1923), and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), once parents select a school for their child, parents cannot "compel public schools to follow their own idiosyncratic views as to what information the schools may dispense." *Fields*, 427 F.3d at 1206. Parents have only a limited substantive due process right "to be free from state

interference with their choice of the educational forum itself."
*Fields*, 427 F.3d at 1197, 1207. The district court concluded
that the parents did not allege they were unable to send their
children to the school of the parents' choosing, and therefore
did not state a plausible substantive due process claim. *Cal.
Parents for Equalization of Educ. Materials*, 267 F. Supp. 3d
at 1224–25.

The district court dismissed one of Appellants'
Establishment clause claims, concluding that an objective
reading of the curriculum materials revealed no
unconstitutional endorsement of Christianity, Judaism, or
Islam. *Id.* at 1228. The materials permissibly called for
students to learn about the major events and figures of various
world religions. The district court did not, at the same time,
dismiss Appellants' other Establishment clause claim, that the
curriculum materials had the primary effect of disparaging
Hinduism, but later ruled against Appellants on that claim at
summary judgment. *See Cal. Parents for Equalization of
Educ. Materials*, 370 F. Supp. 3d at 1067–1083.

In that later opinion, the district court concluded that
neither the allegations of the complaint, nor any additional
materials adduced on summary judgment, reflected content
that disparaged Hinduism. First, the district court explained
that, contrary to Appellants' contentions, the Standards and
Framework do in fact describe the divine origins of Hinduism
and the divine significance of the Bhagavad Gita and other
sacred texts. *Id.* at 1070. Although Appellants had asserted
that the Standards and Framework promote an outdated
theory that Hinduism was the result of an Aryan invasion, the
district court explained that the Standards and Framework,
read together, refer to a migration of people speaking Indic
languages southward into the region. *Id.* at 1074–75. The

materials also acknowledge a competing theory that the language spread northward. Neither theory suggests a connection between invasions and the development of Hinduism. *Id*. at 1075. The theories refer to historical events. As the district court summed it up, "[w]hether or not there was an influx of Aryans into South Asia in 1500 BCE is appropriately the subject of a history and social science curriculum, and not actually a positive or negative statement about Hinduism." *Id*.

The district court also dealt specifically with Appellants' argument that the material contains a description of the caste system as a Hindu religious belief and that the description has the primary effect of disparaging Hinduism. *Id*. at 1071–73. The court pointed out that the Framework expressly acknowledges that all early civilizations had social class systems. The Hindu religion was thus not singled out for criticism of its caste or class system. The district court, after examining the Standards and Framework, concluded that an objective, reasonable observer would not conclude that the material**s** have the primary effect of disparaging Hinduism. *Id*. at 1079.

At summary judgment, Appellants offered an expert report to explain the significance of certain terms from the perspective of an academic religious scholar. The district court declined to consider the expert report. *Id*. at 1070 n.8. The court explained that the report was not relevant to the court's analysis of the critical issue. *Id*. The question was whether the materials primarily communicate a message of disparagement from the perspective of a reasonable observer, and not from the perspective of an expert. The court cited *Brown v. Woodland Joint School District*, where we held that

expert testimony was irrelevant to the effect of challenged material on a child. *Id.*

## II.  CONTENTIONS ON APPEAL

### A.  Equal Protection

The district court held that because Appellants' Equal Protection claim was based on objections to course content, it was "squarely foreclosed" by *Monteiro*'s holding such challenges are barred. *Cal. Parents for Equalization of Educ. Materials*, 267 F. Supp. 3d at 1232.  Appellants argue that *Monteiro* does not control because they allege a discriminatory policy exempted from *Monteiro*'s holding. There is no such allegation.

Appellants' brief recites the allegations of the complaint that the Standards and Framework discriminate against Hinduism by treating it less favorably than other religions. The allegations contain no reference to State Board policy, nor do the allegations describe any materials used in the classroom from which such a policy could be inferred.  As the district court emphasized, the Standards and Framework are never seen by the students. *See Cal. Parents for Equalization of Educ. Materials*, 267 F. Supp. 3d at 1222 ("Notably, students do not read either the Standards or the Framework.").  The district court correctly characterized Appellants' claims as an indirect attack on curricula. Plaintiffs are the parents of students, and the underlying harm Appellants are complaining of is alleged discrimination in the educational materials the students receive.  Yet *Monteiro* holds that, at least absent evidence of unlawful intentional discrimination, parents are not entitled to bring Equal Protection claims challenging curriculum content. *Monteiro*,

158 F.3d at 1031–32.  *Monteiro* thus bars Appellants' principal Equal Protection claim.  *See id*.; *see also Noonan*, 600 F. Supp. 2d at 1111.

Appellants separately challenge the process leading up to the adoption of the Framework as discriminatory against Hindus.  Again, no discriminatory policy is described or articulated, only examples of what Appellants assert to be discriminatory treatment in the development of the content of the Framework.  Appellants' claim is that the State Board failed to incorporate their requested edits, and solicited and accepted some suggestions from a group of historical scholars that they regard as hostile to Hinduism.  We agree with the State Board that Appellants may not like the edits made to the Framework, but that a dislike of challenged content does not constitute a constitutional violation of Equal Protection, absent a plausible allegation of discriminatory policy or intent.  *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1166–67 (9th Cir. 2005); *Monteiro*, 158 F.3d at 1026 (explaining that, to plead a successful Equal Protection claim, plaintiffs must "plead intentional unlawful discrimination or allege facts that are at least susceptible of an inference of discriminatory intent.").  We therefore conclude that the district court properly dismissed both Equal Protection claims.

## B.  Free Exercise

The district court also dismissed Appellants' Free Exercise clause claim because the court found Appellants failed to allege any burden on their religious exercise or practice.  Appellants do not challenge that conclusion here. Pleading such a burden is required by our decisions in *American Family Association*, 277 F.3d at 1124 and *Vernon*

*v. City of Los Angeles*, 27 F.3d 1385, 1393 (9th Cir. 1994). Appellants' only argument is that the district court failed adequately to take into account three recent Supreme Court decisions, and that these decisions have eliminated the requirement that plaintiffs plead a burden on their religious exercise.

The three recent Supreme Court cases are *Trinity Lutheran Church v. Comer*, 137 S.Ct. 2012 (2017), *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 138 S.Ct. 1719 (2018), and *Espinoza v. Montana Department of Revenue*, 140 S.Ct. 2246, 2252 (2020)*. Trinity Lutheran* and *Espinoza* both involved state programs that excluded religious entities. *See Trinity Lutheran*, 137 S.Ct. at 2017; *Espinoza*, 140 S.Ct. at 2252. *Trinity Lutheran* concerned exclusion of religious institutions from a state program providing assistance to schools. 137 S.Ct. at 2017. *Espinoza* dealt with a program granting tax credits for contributions to schools, but exempted contributions to religious schools. 140 S.Ct. at 2252. In both cases, the Supreme Court held that the exclusion of religious institutions from the programs violated the First Amendment's Free Exercise clause. The Court ruled that the exclusion of religious institutions from beneficial programs amounted to a financial penalty, and that the Free Exercise clause prohibits such "indirect coercion or penalties on the free exercise of religion." *Trinity Lutheran*, 137 S.Ct. at 2022; *Espinoza*, 140 S.Ct. at 2256.

Although the district court did not have the opportunity to analyze these cases in its opinion dismissing Appellants' Free Exercise clause claims, these cases do not alter the district court's analysis in this case. We are not dealing with a state program that provides financial or other similar benefits. The state has not carved out any exclusion for religious education

in the curriculum materials. Appellants allege no penalty or coerced conduct. As the district court said, Appellants failed to allege "any specific religious conduct that was affected by the Defendants' actions." *Cal. Parents for Equalization of Educ. Materials*, 267 F. Supp. 3d at 1226 (citing and quoting *Am. Fam. Ass'n*, 277 F.3d at 1124). The complaint has not alleged interference with Appellants' exercise of their religion under our Constitution as required for a viable Free Exercise claim under *Trinity Lutheran* and *Espinoza*.

In the third recent case that Appellants cite, *Masterpiece Cakeshop*, the Supreme Court dealt with overt expressions of hostility on the part of officials adjudicating claims under a state's civil rights law. 138 S.Ct. at 1729–31. One official expressed deep and open skepticism as to whether the claimants' religious beliefs were sincerely held. *Id*. at 1729 ("Freedom of religion . . . has been used to justify all kinds of discrimination throughout history, whether it be slavery, whether it be the holocaust. . . it is one of the most despicable pieces of rhetoric that people can use to—to use their religion to hurt others."). The Court there held that such an expression of "clear and impermissible hostility toward the sincere religious beliefs that motivated his objection" interfered with the claimant's Free Exercise rights during that adjudicatory process. *Id*. at 1729. We have no expressions of hostility here.

Appellants allegations suggest at most that portions of the Standards and Framework contain material Appellants find offensive to their religious beliefs. As the district court said, "[a]t its core, Plaintiffs' Free Exercise clause argument seems to be that the public school curriculum conflicts with their religious beliefs." *Cal. Parents for Equalization of Educ. Materials*, 267 F. Supp. 3d at 1226. Offensive content that

does not penalize, interfere with, or otherwise burden religious exercise does not violate Free Exercise rights. *See Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1533–34 (9th Cir. 1985); *see also id*. at 1543 (Canby, J., concurring) ("[G]overnmental actions that merely offend . . . religious beliefs do not on that account violate free exercise"; an "actual burden on the profession or exercise of religion is required.").

## C. Substantive Due Process

The Fourteenth Amendment guarantee of due process has a substantive component that includes a parent's right to make decisions regarding the "care, custody and control of their children." *Troxel v. Granville*, 530 U.S. 57, 69 (2000). Appellants recognize, however, that with respect to education, parents have the right to choose the educational forum, but not what takes place inside the school. As we said in *Fields*, the substantive due process right "does not extend beyond the threshold of the school door." 427 F.3d at 1207. Parents therefore do not have a due process right to interfere with the curriculum, discipline, hours of instruction, or the nature of any other curricular or extracurricular activities. We reiterated this principle recently in *McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700 (9th Cir. 2019) (per curiam). We there repeated our statement in *Fields* that once the choice of school is made, parental rights are "substantially diminished." *Id*. at 711 (citing and quoting *Fields*, 427 F.3d at 1206).

In this appeal, Appellants argue that by recognizing a "diminished" substantive due process right in *McNeil* and *Fields*, we somehow, and without saying so, preserved their ability to raise religious objections to the Standards and

Framework.  Citing a law review article, Appellants observe that the Supreme Court has used the due process clause to "further equality concerns . . . relating to . . . religious minorities."  Kenji Yoshino, *The New Equal Protection*, 124 Harv. L. Rev. 747, 749–50 (2011).  They rely on this backdrop to support their argument for a broad due process right to challenge materials that they view as religiously bigoted.  *McNeil* represents a refutation of Appellants' position.  In *McNeil*, the parents complained about their child's expulsion for creating a hit list.  918 F.3d at 704. There, we said that once parents select a school, they "accept[ ] [that school's] curriculum, school policies, and reasonable disciplinary measures."  *Id*. at 711.  Our law has recognized no exceptions.

## D.  Establishment Clause

Appellants argue that the district court mishandled their Establishment clause claims in several respects.  Without directly responding to the district court's careful refutation of their characterizations of the Standards and Framework, Appellants argue that an objective reading of those materials reveals an impermissible endorsement of Judaism, Christianity, and Islam and that the court incorrectly granted the State Board summary judgment on Appellants' claim that those materials disparage Hinduism.  They also argue that the district court should not have excluded their expert report produced at summary judgment. We address each of these arguments in turn.

Before addressing the merits of Appellants' Establishment clause claims, however, we first address the evidentiary argument they raise.  At summary judgment, Appellants produced an expert report in support of their claim that the

Standards and Framework have the primary effect of disparaging Hinduism. That expert report concluded that the 1998 Standards contained outdated, offensive, and disparaging information about Hinduism. Appellants now argue that the district court improperly excluded that report because, without it, the offensiveness of certain terms is not obvious by reading the text of the Standards and Framework alone.

But that absence of facially apparent disparagement is the reason why the district court excluded the expert report from its consideration, and also why Appellants' claim that the Standards and Framework primarily communicate a message of disapproval of Hinduism fails. An expert's understanding of the terms is irrelevant. We must evaluate the Standards and Framework from the perspective of an objective, reasonable observer, and not that of an academic who is an expert in the field. *See e.g. Lee v. Weisman*, 505 U.S. 577, 593 (1992); *Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1037–38 (9th Cir. 2010); *see also Brown*, 27 F.3d at 1382 (agreeing with that district court that the expert opinion was not relevant to primary effect test). We therefore cannot conclude that the district court abused its discretion by refusing to consider Appellants' expert report in its analysis. *See id*; *Noonan*, 600 F. Supp. 2d at 1118 (rejecting "various expert opinions" offered by both parties).

Turning now to the merits of Appellants' Establishment clause claims, we conclude, as did the district court, that the Standards and Framework do not call for the teaching of biblical events or figures as historical fact, thereby implicitly endorsing Judaism, Christianity, and Islam. The materials do not take a position on the historical accuracy of the stories or figures, and the Supreme Court has told us that mere

inclusion of passages from the Bible in course materials does not violate the Constitution. *See Grove*, 753 F.2d at 1539–40 (1985) (Canby, J. concurring) (citing *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 225 (1963)).

We also conclude, as did the district court, that none of Appellants' characterizations of the Hinduism materials as disparaging is supported by an objective reading of those materials. The Framework acknowledges the divine origins of Hinduism, and describes how these sacred beliefs were written down in texts like the Bhagavad Gita. *See Cal. Parents for Equalization of Educ. Materials*, 370 F. Supp. 3d at 1071. The Standards and Framework reference an invasion, but do not call for teaching students that an invasion from the north caused the development of Hinduism in ancient India. From an objective perspective, none of the challenged material, alone or considered together, has the effect of disparaging Hinduism.

We do not doubt the sincerity of Appellants' challenge to the Standards and Framework. The courts are called upon to view the passages objectively and from the perspective of the reasonable person. *See Brown*, 27 F.3d at 1378–79. As the district court noted, an "objective, reasonable observer would find much of the challenged material entirely unobjectionable." *Cal. Parents for Equalization of Educ. Materials*, 370 F. Supp. 3d at 1079. But even if isolated passages could be read as implying some hostility toward religion—which they do not—they would not violate the Establishment clause unless that were the "principal or primary effect." *C.F. v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 985–86 (9th Cir. 2011) (citing *Am. Fam. Ass'n*, 277 F.3d at 1121). The Standards and Framework reflect

careful crafting by the State Board to achieve a balanced portrayal of different world religions.

## III. CONCLUSION

The district court ably sorted through Appellants' allegations in this case to describe the deficiencies of their arguments in light of contemporary constitutional principles. We agree with the district court that the challenged content of the Standards and Framework, and process leading up to the Framework's adoption, did not disparage or otherwise express hostility to Hinduism in violation of the Constitution.

**AFFIRMED.**

BRESS, Circuit Judge, concurring:

The majority opinion correctly holds that there is no basis in this record to conclude that the defendants discriminated against Hinduism, expressed a hostility toward it, or burdened the practice of that religion. The majority opinion also properly rejects the plaintiffs' Establishment Clause challenge. The Establishment Clause certainly does not prevent California from educating students about world religions and their role in human civilizations. *See, e.g.*, *Lynch v. Donnelly*, 465 U.S. 668, 679–80 (1984). Plaintiffs' efforts to wring an Establishment Clause violation from subtle differences that they perceive in the curricular treatment of various religions does not withstand scrutiny, and, if accepted, would paralyze educators in their lawful objective of treating religion as a topic relevant to world history.

I note that some portions of the majority opinion discussing plaintiffs' Establishment Clause claim draw upon Ninth Circuit precedent that is based on *Lemon v. Kurtzman*, 403 U.S. 602 (1971). The list of situations in which the Supreme Court has effectively repudiated the *Lemon* test, either by "expressly declin[ing] to apply the test or [] simply ignor[ing] it," has grown quite long. *American Legion v. American Humanist Ass'n*, 139 S. Ct. 2067, 2080 (2019) (plurality op.). But to my understanding, the circuit precedent on which the majority opinion relies remains binding on this panel in this case. Regardless, whether under a *Lemon*-based test or an Establishment Clause analysis more appropriately grounded in the history and traditions of this country, *id.* at 2089–90; *id.* at 2092–94 (Kavanaugh, J., concurring); *id.* at 2096 (Thomas, J., concurring in the judgment), there was no establishment of religion here.