**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

KEVIN CHEN, through his
Guardian Kai Dong Chen,

          Plaintiff-Appellant,

 and

PHILIP SHEN, through his
Guardian John Shen; NIMA
KORMI, through his Guardian
Ellie Kormi; MICHAEL BALES,
through his Guardian Patricia
Mingucci,

          Plaintiffs,

  v.

ALBANY UNIFIED SCHOOL
DISTRICT; VALERIE
WILLIAMS, in her personal and
official capacities as
Superintendent of the Albany
Unified School District; JEFF
ANDERSON, in his personal and
official capacities as Principal of
Albany High School; MELISA
PFOHL, in her personal and
official capacities as Assistant

No. 20-16540

D.C. No. 3:17-cv-
02478-JD

OPINION

Principal of Albany High School,

Defendants-Appellees,

and

ALBANY HIGH SCHOOL,

Defendant.

CEDRIC EPPLE,

Plaintiff-Appellant,

v.

ALBANY UNIFIED SCHOOL DISTRICT; ALBANY HIGH SCHOOL; VALERIE WILLIAMS, in her personal and official capacities as Superintendent of the Albany Unified School District; JEFF ANDERSON, in his personal and official capacities as Principal of Albany High School; MELISA PFOHL, in her personal and official capacities as Assistant Principal of Albany High School; CHARLES BLANCHARD; JACOB CLARK; KIM TRUTANE; ALBANY UNIFIED

No. 20-16541

D.C. No. 3:17-cv-03657-JD

SCHOOL DISTRICT BOARD
OF EDUCATION,

    Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of California
James Donato, District Judge, Presiding

Argued and Submitted December 6, 2021
San Francisco, California

Filed December 27, 2022

Before: Ronald M. Gould and Daniel P. Collins, Circuit
Judges, and Roslyn O. Silver,[*] District Judge.

Opinion by Judge Collins;
Concurrence by Judge Gould

---

[*] The Honorable Roslyn O. Silver, United States District Judge for the
District of Arizona, sitting by designation.

# SUMMARY[**]

## First Amendment / Free Speech

The panel affirmed the district court's judgment rejecting First Amendment claims brought by students against Albany High School and school officials after the students were disciplined for assertedly "private" off-campus social media posts that amounted to severe bullying or harassment targeting particular classmates.

The panel held that, under the circumstances of the case, the school properly disciplined two of the involved students for bullying. Students Kevin Chen and Cedric Epple claimed that defendants violated their free speech rights under the First Amendment, the California Constitution, and the California Education Code. They argued that their speech was not susceptible to regulation because they engaged in it off campus, and therefore defendants could not constitutionally discipline them.

First, the panel discussed the framework that the Supreme Court has established for determining whether school districts can discipline students for on-campus speech. Under that framework, students do not have a First Amendment right to target specific classmates in an elementary or high school setting with vulgar or abusive language. As a result, there was no question that Epple and Chen could be disciplined for their speech had it occurred on campus. The posts in the social media account include

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

vicious invective that was targeted at specific individuals and that employed deeply offensive and insulting words and images that, as used here, contribute nothing to the "marketplace of ideas." Moreover, some of the posts used violent imagery that, even if subjectively intended only as immature attempts at malign comedy, would reasonably be viewed as alarming, both to the students targeted in such violently-themed posts and to the school community more generally. Nothing in the First Amendment would even remotely require schools to tolerate such behavior or speech that occurred under its auspices.

Second, the panel considered whether Epple and Chen were insulated from discipline because their speech occurred off campus. The panel concluded, taking into account the Supreme Court's recent decision in *Mahoney Area Sch. Dist. v. B.L. ex rel. Levy*, 141 S. Ct. 2038 (2021), that the speech bore a sufficient nexus to Albany High School and its students to be susceptible to regulation by the school. Specifically, the panel applied the sufficient-nexus test, outlined in *McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 707 (9th Cir. 2019), to the speech at issue here, keeping in mind the additional considerations identified in *Mahoney*. Under *McNeil*, Epple's subjective intention to keep the account private was not controlling. The panel held that given the ease with which electronic communications may be copied or shown to other persons, it was plainly foreseeable that Epple's posts would ultimately hit their targets, with resulting significant impacts to those individual students and to the school as a whole. The remaining *McNeil* factors strongly supported the school's assertion of disciplinary authority. Although Chen's involvement in the account was substantially more limited that Epple's, the panel concluded that he was

nonetheless properly subject to discipline as well. Chen contributed to the account multiple times in ways that were directly related to Albany High School. As with Epple, Chen's conduct had a sufficient nexus to Albany High School and, under *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), was properly subject to discipline. Accordingly, the panel rejected Epple's and Chen's claims that their First Amendment rights were violated by defendants' disciplinary actions towards them.

Finally, the panel concluded that the discipline did not independently violate the California Constitution or the California Education Code. Because California follows federal law for free expression claims arising in a school setting, Epple's and Chen's reliance on the California Constitution failed for the same reasons discussed above. The panel held that Epple's and Chen's reliance of California Education Code §§ 48950(a) and 48907 similarly failed, and it did not preclude defendants from disciplining Epple and Chen.

Epple claimed that he was deprived of his due process right to a fair hearing before an impartial tribunal because a member of the school board who voted to expel him was biased against him. The district court dismissed this claim on the ground that Epple had failed to exhaust judicial remedies. Even if Epple's judicial remedies were exhausted, the panel affirmed the dismissal of Epple's due process claim on the separate ground that a California state court's decision rejecting Epple's claims of bias had preclusive effect here.

Judge Gould concurred. He wrote separately, in light of the continued disturbing prevalence of hate speech, to

underscore that the First Amendment and Supreme Court precedent do not require courts to always strike down a government entity's attempts to prevent harm to their citizens—especially in the context of hateful speech at schools harming children.

## COUNSEL

Alan Alexander Beck (argued), Law Offices of Alan Beck, San Diego, California; Darryl D. Yorkey, Law Offices of Darryl Yorkey, Berkeley, California; for Plaintiffs-Appellant.

Seth L. Gordon (argued), Katherine A. Alberts, and Louis A. Leone, Leone Alberts & Duus APC, Concord, California, for Defendants-Appellees.

## OPINION

COLLINS, Circuit Judge:

This case concerns a public high school's ability under the First Amendment to discipline students for assertedly "private" off-campus social media posts that, once they predictably made their way on to campus, amounted to "severe bullying or harassment targeting particular" classmates. *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 141 S. Ct. 2038, 2045 (2021). We hold that, under the circumstances of this case, the school properly disciplined

two of the involved students for bullying. We therefore affirm the district court's judgment rejecting the students' First Amendment claims against the high school and others.

# I

## A

Because this appeal arises from a grant of summary judgment against the student Plaintiffs, "we must credit [their] evidence as true and draw all reasonable inferences in [their] favor." *Demarest v. City of Vallejo*, 44 F.4th 1209, 1213 (9th Cir. 2022). For purposes of these appeals, we therefore take the following facts as true.

During the 2016–2017 school year, Plaintiffs-Appellants Cedric Epple and Kevin Chen were students at Albany High School ("AHS"), a public high school in Albany, California. In November 2016, at the suggestion of a friend, Epple created a private Instagram account to share comments "privately with my small group of friends." Unlike Epple's "'main' Instagram account," which he used to "share images that are appropriate for a wide audience," he intended this new account, which operated under the username "yungcavage," to be "a private forum where [he] could share funny memes, images, and comments with [his] close friends that [they] thought were funny, but which other people might not find funny or appropriate." Epple attempted to keep the account "very private," rejecting several requests to follow the account and only approving requests to "follow" the account from "close friends" that he thought he "could trust to keep the material private." Over the ensuing months, Epple only allowed about "13 people to follow the account," including Chen. He "never intended any person outside [his] close group of friends to see the images [he]

posted to the account."  Chen "followed" the account using the Instagram username "kkkevinkkkkk."  Chen likewise understood that Epple's second Instagram account was to "be a private forum (by invite only), exclusive to [their] friends, and a place where [they] could share sarcasm, jokes, funny images, and other banter privately."  Not all of the persons who eventually followed the account knew who the owner of the account was.

Between November 2016 and March 2017, Epple used the account to make a number of cruelly insulting posts about various AHS students.  These ranged from immature posts making fun of a student's braces, glasses, or weight to much more disturbing posts that targeted vicious invective with racist and violent themes against specific Black classmates.  For example, in early February 2017, Epple uploaded a photograph in which a Black member of the AHS girls' basketball team was standing next to the team coach, who was also Black, and Epple drew nooses around both their necks and added the caption "twinning is winning."  In another post, he combined (1) a screen shot of a particular Black student's Instagram post in which she stated "I wanna go back to the old way" with (2) the statement "Do you really tho?", accompanied by a historical drawing that appears to depict a slave master paddling a naked Black man who is strung up by rope around his hands.  On February 11, 2017, he posted a screenshot of texts in which he and a Black classmate were arguing, and he added the caption "Holy shit I'm on the edge of bringing my rope to school on Monday."  Other posts, although not referencing specific students, contained images either depicting, or making light of, Ku Klux Klan violence against Black people.  One post included what appears to be a historical photograph of a lynched man still

hanging from a tree; another depicts a Klan member in a white hood; and a third combines the caption "Ku klux starter pack" with pictures of a noose, a white hood, a burning torch, and a Black doll.

Epple also created several posts that, while omitting references to violence, still aimed highly offensive racist insults at identifiable Black classmates.  In one, he uploaded an image of a Black student sitting in class that was captioned with the statement "The gorilla exhibit is nice today."  In another post, Epple included side-by-side images of one of his Black classmates and a gorilla.  Chen added a comment on that post stating, "Its too good," but one of the private account's other followers responded with a series of comments saying: "Hey not funny," "Fuck you," and "Delete this."  Chen then responded to these comments with a further comment stating, "no fuck YOU you dirty zookeeping son of a bitch."  Two of Epple's other posts feature the back of the head of two different Black students while each was sitting in class, with the first including his comment "Fucking nappy ass piece of shit" and the second saying "Fuck you."  After a Black classmate asked to join the account, Epple made a post asking his followers, "Who the fuck is this nigger."  Chen responded by "liking" that post.

In addition to the comments mentioned earlier, Chen contributed to the Instagram account on several other occasions.  For example, he took a picture of a Black student during class, without her permission, and sent it by Snapchat with the caption, "She's eating a fucking carrot"; Epple then posted that captioned picture to the Instagram account.  In comments on another post, Chen called a non-Black student who followed the account a "nigger" after the student guessed (incorrectly) that Chen was the owner

of the account.

Although the "yungcavage" account was intended to be private, knowledge of its contents eventually spread to the school. During the weekend of March 18–19, 2017, one of the account's followers showed multiple photos from that account to the girls' basketball player who had been depicted with a noose. On Monday, March 20, that student, in turn, shared what she had learned with several other students who had been targeted by the account's posts. That same day, one of the followers of the account was asked to lend his phone to a student who claimed to need to call her mother, and while this student had the phone, she took it into the restroom, where she and another student took pictures of some of the contents of the yungcavage account. Those photographs were then shared with other students.

As knowledge of the account rapidly spread, a group of about 10 students gathered at the school, several of whom were upset, yelling, or crying. Although the next class period had started, the students "were all too upset to go to class." The school's Principal, Jeff Anderson, asked them to come to the conference room adjacent to his office, where they were joined by two of the school's Assistant Principals, Melisa Pfohl and Tami Benau. Benau stated that she had "never seen a group of students as upset as these girls were." The school administrators summoned the school's counselors and mental health staff to join them, and around the same time, some of the students' parents (who had presumably been contacted by their children) began to arrive.

After being shown some of the account's posts, Benau concluded that the posts depicting lynching and nooses

could be construed as threats of violence, and she therefore called the police. The school administrators arranged for the students to provide written statements, and Benau and the police also interviewed some of the students. The next day, March 21, Anderson, Pfohl, and two police officers met with each of the three students who had been identified as being responsible for the account (Epple, Chen, and one other), together with at least one of the parents of each respective student. Epple "took full responsibility for creating all the images and posts." Chen admitted that he followed the Instagram account and that he had "liked" and commented on some of the posts. All three students were suspended for five days. A few days later, Anderson separately told Epple and Chen that he was going to recommend that they be expelled and that their suspensions would continue pending those expulsion proceedings. In later explaining the grounds for the suspensions, Anderson stated that posts on the account constituted "harassment and bullying based on race and gender" and that he had an obligation under California and federal law "to respond to peer to peer harassment that could cause a hostile environment."

Anderson called a faculty meeting after school on March 21 to discuss the incident. The teachers complained that the meeting should have been held the day before, because a "majority" of the students knew about the matter and wanted to talk about it in class, leaving the teachers to deal "with the situation all day without any official information from the school." As Anderson later explained it, the teachers said that "a lot of students were upset by what they had heard about the account and wanted to talk about it in class, which disrupted [the teachers'] plans for the class."

The record contains additional undisputed evidence concerning the effect that knowledge of the Instagram account had on students at AHS.  On March 20, the student who had been targeted in the post containing a drawing of a slave being abused left school early because she "was too upset to return to class."  She also reported being afraid to go to one of her classes because the students in that class included one who had favorably commented on a post that included a photograph of a hooded Klansman.  Another Black student stated that she missed multiple days of school after learning that a post made fun of her "Afro" hair style and her physical appearance, and her parents eventually withdrew her from AHS.  Other students targeted by the posts reported that they felt "devastated," "scared," and "bullied," and that their grades suffered.  According to Pfohl, "[t]he AHS school counselors and mental health staff were inundated with students needing help to handle their feelings of anger, sadness, betrayal and frustration about the racist posts and comments in the Instagram account."  Albany Unified School District ("AUSD") Superintendent Valerie Williams described the incident's impact:

> From my meetings with the students that were shown in the postings and conversations with several parents of the students, the impact has been significant and ongoing.  Parents stated they are afraid for their children's safety on campus and off campus.  They stated that their children are traumatized and cannot study, and that they are afraid to be in the same class or on the same campus as the students who posted.  Several of the students' grades dropped

> because they were unable to attend school or
> some classes, and they are now worried
> about failing their classes. Some students
> could not return to school for several days.
> Most of the students say they are hurt, angry
> and feel betrayed. One parent reported to
> me that his daughter has lost sleep, that
> sometimes she can talk about the incident
> and sometimes she is too upset to talk at all
> about the postings.

A group of school parents organized a rally on March 26, 2017 "to bring people together and start the healing process." AUSD Board of Education ("AUSD Board") member Kim Trutane posted on Facebook about the rally, saying, "[H]as this been conceived in coordination with the Black/African American Parents Engagement Group?" and "So glad that you are joining forces! I am definitely going . . . . Looking forward to sending a strong message of support . . . that we will not tolerate racism, Albany is for everyone!" One local publication that covered the rally published a picture of Trutane at the event, holding a sign saying, "WE are DIVERSE & GREAT."

Another student who had followed the account was suspended for only five days and returned to school on March 30. Later that afternoon, he attended, together with other student followers of the account, a "restorative justice session" organized by AHS, using the services of a local community organization. More than 100 protestors gathered outside the session, which led some of the participants to fear for their safety. After waiting several hours while the demonstration continued, the student

followers of the account who were at the meeting decided to leave the school.  On their way out of the building, a student demonstrator punched two of them in the face, breaking the nose of one of them.

Chen's and Epple's expulsion hearings before the AUSD Board were scheduled for June 1, 2017.  However, on May 1, Chen and three other students filed a federal suit against AUSD, and on May 26, the district court issued a temporary restraining order enjoining his expulsion hearing.  Epple's expulsion hearing went forward on June 1 was concluded on June 20.  On June 22, three members of the AUSD Board, including Trutane, voted in favor of expulsion, and two members abstained.

Epple appealed his expulsion to the Alameda County Board of Education ("ACBE"), arguing, *inter alia*, that he was denied a fair hearing because Trutane was biased against him.  According to Epple, Trutane should have recused herself from the AUSD Board's expulsion hearing because she participated in a demonstration and other advocacy against Epple and his account.  The ACBE disagreed and upheld Epple's expulsion in September 2017. Epple filed a petition for a writ of mandate in California state court.  The state court denied his petition on October 1, 2020, after finding that ACBE applied the correct legal standard and that the record did not demonstrate an unacceptable probability that Trutane was biased.[1]

---

[1] We grant Epple's motion to take judicial notice of the state court's order denying his petition.

## B

Four days after the AUSD Board voted to expel him, Epple filed a federal action against AUSD, the AUSD Board, the three AUSD Board members who had voted to expel him, the AUSD Superintendent (Williams), AHS, Principal Anderson, and Assistant Principal Pfohl.  Epple alleged that Defendants had violated his free speech rights under the First Amendment and California law, and he also asserted that all Defendants except Williams, Anderson, and Pfohl had violated his due process rights in connection with his expulsion hearing.  As noted above, Chen and three other students had already filed a similar action several weeks earlier.  Chen and those students named as defendants AUSD, AHS, Superintendent Williams, Principal Anderson, and Assistant Principal Pfohl.[2]  In that complaint, Chen alleged similar free speech claims against all Defendants, and he also contended that all Defendants had violated his due process rights in connection with his suspension.  Two other lawsuits were filed and ultimately joined by a total of five other students who had been disciplined for their involvement with the Instagram account.  *See John Doe v. Albany Unified Sch. Dist.*, 3:17-cv-02767-JD (N.D. Cal. filed May 12, 2017); *John Doe v. Albany Unified Sch. Dist.*, 3:17-cv-03418-JD (N.D. Cal. filed June 13, 2017).  The district court deemed all of these cases related.  All plaintiffs filed motions for summary judgment on their respective free speech claims, and Defendants filed cross-motions for full or partial summary judgment.

---

[2] Chen and his co-plaintiffs also initially asserted claims against an AHS teacher, but those claims were promptly voluntarily dismissed.

On November 29, 2017, the district court held in Defendants' favor with respect to Epple's, Chen's, and four other plaintiffs' free speech claims.  The district court reasoned that under *C.R. v. Eugene School District 4J*, 835 F.3d 1142 (9th Cir. 2016), these six plaintiffs' speech was susceptible to regulation by the school because (1) the speech had a sufficient nexus to the school; and (2) it was reasonably foreseeable that the speech would reach the school and create a risk of a substantial disruption.  The district court then found that under the Supreme Court's decision in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), these six plaintiffs were properly disciplined because their speech caused or contributed to a substantial disruption at AHS and "clearly interfered with 'the rights of other students to be secure and to be let alone'" (quoting *Tinker*, 393 U.S. at 508).  The court held that the four remaining plaintiffs—none of whom are involved in this appeal—could not be disciplined under *Tinker* because they had not "create[d] a substantial risk of disruption," nor had they "interfered with the rights of other students."

By April 2018, the only plaintiffs whose claims remained at issue were Epple, Chen, and one of Chen's co-plaintiffs.  In August 2018, the district court dismissed Epple's and Chen's due process claims without prejudice, holding that, because they had not yet filed a petition for writ of mandate in California state court challenging the relevant administrative actions, they had failed to exhaust still-available judicial remedies.[3]  *See Doe v. Regents of the*

---

[3] As noted earlier, after the district court issued its order, Epple filed a petition for writ of mandate in California state court. *See supra* at 15.

*Univ. of Cal.*, 891 F.3d 1147, 1154–55 (9th Cir. 2018) (holding that, in order to attempt to avoid the preclusive effect of a California state administrative decision, a party "must exhaust judicial remedies" by filing a petition for writ of mandate). Due to delays associated with proceedings concerning the remaining co-defendant, the district court did not enter final judgment against Epple and Chen until July 27, 2020. Epple and Chen timely appealed.

The district court had original jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 and we have appellate jurisdiction under 28 U.S.C. § 1291. We review de novo both the district court's grant of summary judgment regarding Epple's and Chen's free speech claims, *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 987 (9th Cir. 2001), and its dismissal, under Federal Rule of Civil Procedure 12(b)(6), of Epple's due process claim. *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 526 (9th Cir. 1992).

## II

Epple and Chen claim that Defendants violated their free speech rights under the First Amendment, the California Constitution, and the California Education Code. They argue that their speech was not susceptible to regulation because they engaged in it off campus, and therefore Defendants could not constitutionally discipline them. We affirm the district court, and our analysis proceeds in three steps. First, we discuss the framework that the Supreme Court has established for determining whether school districts can discipline students for on-campus speech. Under this framework, there is no question that Epple and Chen could be disciplined for their speech had it occurred on campus. Second, we consider whether Epple and Chen are insulated from discipline because their

speech occurred off campus. Taking into account the Supreme Court's recent decision in *Mahanoy*, we conclude that the speech bore a sufficient nexus to AHS and its students to be susceptible to regulation by the school. Finally, we conclude that the discipline did not independently violate the California Constitution or the California Education Code.

## A

"The First Amendment guarantees wide freedom in matters of adult public discourse," but that does not mean that "the same latitude must be permitted to children in a public school." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). The Supreme Court has made clear that "the First Amendment rights of students in the public schools 'are not automatically coextensive with the rights of adults in other settings,' and must be 'applied in light of the special characteristics of the school environment.'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (citations omitted). "[A] school need not tolerate student speech that is inconsistent with its basic educational mission." *LaVine*, 257 F.3d at 988 (citing *Kuhlmeier*, 484 U.S. at 266). "In a math class, for example, the teacher can insist that students talk about math, not some other subject. In addition, when a teacher asks a question, the teacher must have the authority to insist that the student respond to that question and not some other question, and a teacher must also have the authority to speak without interruption and to demand that students refrain from interrupting one another." *Mahanoy*, 141 S. Ct. at 2050 (Alito, J., concurring) (citation omitted).

More generally, the conduct of students in the school setting, including their speech, may be restricted if either

[1] it "might reasonably [lead] school authorities to forecast substantial disruption of or material interference with school activities" or [2] it "collides 'with the rights of other students to be secure and to be let alone.'" *Wynar v. Douglas Cnty. Sch. Dist.*, 728 F.3d 1062, 1070 (9th Cir. 2013) (quoting *Tinker*, 393 U.S. at 508, 514). The Supreme Court recently clarified that the "standard" for showing a risk of "substantial disruption" is a "demanding" one that requires "something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Mahanoy*, 141 S. Ct. at 2047–48 (quoting *Tinker*, 393 U.S. at 509). And with respect to the second alternative, we have recognized that "[t]he precise scope of *Tinker*'s interference with the rights of others language is unclear," but the speech must be more than "merely offensive to some listener." *C.R.*, 835 F.3d at 1152 (citations omitted).

Moreover, even outside the school setting, "[t]he First Amendment rights of minors are not 'co-extensive with those of adults.'" *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 n.11 (1975) (citation omitted). For example, the "traditional categorical exceptions" from the First Amendment that the Court has recognized, such as obscenity and "fighting words," *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992), may have a broader sweep in the context of minors. *See, e.g.*, *Ginsberg v. New York*, 390 U.S. 629, 636–43 (1968) (upholding a ban on the sale to minors of sexually oriented material deemed to be obscene as to minors, even though the material was entitled to First Amendment protection with respect to adults). That principle acquires special force when applied in the school context, which, as noted, involves "special characteristics" that may justify additional restrictions.

*Kuhlmeier*, 484 U.S. at 266. Thus, whatever the contours of the fighting words doctrine in the context of confrontations among adults in a public forum, *cf. R.A.V.*, 505 U.S. at 414 (White, J., concurring in the judgment) (rejecting, in the context of a facial challenge to an ordinance, a conception of the "fighting words" doctrine that would deem expression to be unprotected merely because it "causes hurt feelings, offense, or resentment"), students do not have a First Amendment right to "target" specific classmates in an elementary or high school setting "with vulgar or abusive language." *See Mahanoy*, 141 S. Ct. at 2047; *see also id*. at 2052 (Alito, J., concurring) ("[A] school must have the authority to protect everyone on its premises, and therefore schools must be able to prohibit threatening and harassing speech."); *cf. Fraser*, 478 U.S. at 682 ("It does not follow . . . that simply because the use of an offensive form of expression may not be prohibited to adults . . . , the same latitude must be permitted to children in a public school."). Without limiting "any political viewpoint" or other protected content, schools may insist on "civil discourse" in the school context, thereby teaching and reinforcing "the shared values of a civilized social order." *Fraser*, 478 U.S. at 683, 685; *see also C.R.*, 835 F.3d at 1152 (distinguishing between speech that "is merely offensive to some listener" and "sexual harassment" targeted at particular students).

Against this backdrop, we readily conclude that the First Amendment would not prevent a school from punishing the sort of speech at issue here had it "occur[red] under [the school's] supervision." *Mahanoy*, 141 S. Ct. at 2045. The posts in the yungcavage account include vicious invective that was targeted at specific individuals and that employed deeply offensive and insulting words and images

that, as used here, contribute nothing to the "marketplace of ideas." *See id*. at 2046; *cf. Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1031–32 (9th Cir. 1998) (rejecting claim that school district violated student's equal protection rights by assigning *Huckleberry Finn*, with its use of racial epithets, as mandatory reading). Moreover, some of the posts used violent imagery that, even if subjectively intended only as immature attempts at malign comedy, would reasonably be viewed as alarming, both to the students targeted in such violently-themed posts and to the school community more generally. In particular, combining photographs of specific students with images drawing upon the horrific legacy of terroristic violence executed by the Klan against Black people would understandably be deeply upsetting and intimidating to the targeted students. *Cf. Virginia v. Black*, 538 U.S. 343, 352–57 (2003) (recounting the Klan's long history of terroristic violence).

Had these posts been printed on flyers that were distributed furtively by students on school grounds but then discovered by school authorities, the "collision with the rights of [the targeted] students to be secure and to be let alone" would be obvious. *Tinker*, 393 U.S. at 508. As we explained in *C.R.*, severe targeted harassment of fellow students based on their physical characteristics—there, sexual harassment that "positions the target as a sexual object" and here, racial harassment that vilifies people based on their race—threatens the targeted students' "sense of physical, as well as emotional and psychological, security." 835 F.3d at 1152; *see also Monteiro*, 158 F.3d at 1033 ("[R]acist attacks need not be directed at the complainant in order to create a hostile educational environment."). And the likelihood of "substantial

disruption of or material interference with school activities" from such malicious abuse aimed at particular students is equally obvious and, as we explain below, amply demonstrated in the record here. *Tinker*, 393 U.S. at 514; s*ee infra* at 28–29. Even assuming *arguendo* that the posts at issue did not amount to unprotected true threats or fighting words, nothing in the First Amendment would even remotely require schools to tolerate such behavior or speech that occurs under its auspices. *Mahanoy*, 141 S. Ct. at 2045.

## B

The central question here is instead whether the assertedly off-campus nature of the speech places it outside of the school's authority to regulate or to discipline. Although *Tinker* involved "only a school's ability to regulate students' *on-campus* speech," *C.R.*, 835 F.3d at 1149, we have held that students' "off-campus speech is not necessarily beyond the reach of a school district's regulatory authority." *McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 706 (9th Cir. 2019). The contours of such authority to regulate off-campus speech were recently considered by the Supreme Court in *Mahanoy*, and so we begin by reviewing that decision and then considering its impact on our caselaw addressing school authority over off-campus speech.

## 1

In *Mahanoy*, a public high school student ("B.L.") who was not selected for the school varsity cheerleading team reacted by posting to Snapchat an image, which would be visible to her approximately 250 "friends" for 24 hours, containing the caption, "Fuck school fuck softball fuck cheer fuck everything." 141 S. Ct. at 2043. She posted the

image on a weekend while she was off campus. *Id*. The school discovered the post and suspended the student from the junior varsity cheerleading squad. *Id*. The student sued, and the Third Circuit held that schools generally may not discipline students for engaging in speech that occurs off-campus. *Id*. at 2043–44.

The Supreme Court rejected the Third Circuit's categorical rule that "the special characteristics that give schools additional license to regulate student speech always disappear when a school regulates speech that takes place off campus." *Mahanoy*, 141 S. Ct. at 2045. The Court held that public schools may regulate *some* off-campus student speech, but it made clear that public schools have diminished authority to regulate off-campus speech as opposed to on-campus speech. In so holding, the Court refused to "set forth a broad, highly general First Amendment rule stating just what counts as 'off campus' speech and whether or how ordinary First Amendment standards must give way off campus to a school's special need to prevent, *e.g.*, substantial disruption of learning-related activities or the protection of those who make up a school community." *Id*. Instead, the Court identified three features of off-campus speech that "diminish the strength of the unique educational characteristics that might call for special First Amendment leeway" in evaluating a school's actions. *Id*. at 2046. First, because "off-campus speech will normally fall within the zone of parental, rather than school-related, responsibility," a school will "rarely" be able to invoke the "doctrine of *in loco parentis*"—*i.e.*, that the school "stand[s] in the place of students' parents"—in attempting to regulate such speech. *Id*. Second, recognizing broad authority in schools over off-campus speech would give them authority over "all the speech a

student utters during the full 24-hour day," which would threaten students' ability to "engage in that kind of speech at all," including potentially "political or religious speech that occurs outside school or a school program or activity." *Id*. Third, schools have both an interest in protecting and an obligation to protect "the 'marketplace of ideas,'" which "must include the protection of unpopular ideas," and that important interest would be threatened by excessive school authority over off-campus speech. *Id*.

Applying these considerations to the school's punishment of B.L.'s speech, the Court held that "the school violated B. L.'s First Amendment rights." *Mahanoy*, 141 S. Ct. at 2048. In reaching this conclusion, the Court emphasized that B.L.'s "posts appeared outside of school hours from a location outside the school"; that she "did not identify the school in her posts or target any member of the school community with vulgar or abusive language"; and that she "transmitted her speech through a personal cellphone, to an audience consisting of her private circle of Snapchat friends." *Id*. at 2047. Given these facts, "B.L. spoke under circumstances where the school did not stand *in loco parentis*," and she was communicating to her friends, on her own time, a protected message of "irritation with, and criticism of, the school and cheerleading communities." *Id*. The Court acknowledged that B.L.'s off-campus actions "risk[ed] transmission [of the posts] to the school itself," *id*., but it concluded that the school had failed to present evidence establishing "the sort of 'substantial disruption' of a school activity or a threatened harm to the rights of others that might justify the school's action." *Id*. (citing *Tinker*, 393 U.S. at 514).

**2**

Although the Supreme Court in *Mahanoy* declined to articulate "a broad, highly general First Amendment rule stating just what counts as 'off campus' speech" or identifying when "a school's special need[s]" as recognized in *Tinker* might justify regulating such speech, *see* 141 S. Ct. at 2045, our caselaw has set forth additional standards that address that issue. Prior to *Mahanoy*, we devised a three-factor test for "determin[ing], based on the totality of the circumstances, whether [off-campus] speech bears a sufficient nexus to the school" to allow regulation by a school district. *McNeil*, 918 F.3d at 707. "This test is flexible and fact-specific, but the relevant considerations will include (1) the degree and likelihood of harm to the school caused or augured by the speech, (2) whether it was reasonably foreseeable that the speech would reach and impact the school, and (3) the relation between the content and context of the speech and the school." *Id*. (citations omitted).

Nothing in *Mahanoy* is inconsistent with our sufficient-nexus test, much less "clearly irreconcilable" with it. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). The Supreme Court's analysis of the school's ability to regulate B.L.'s speech in *Mahanoy* considered many of the same factors, including whether "'substantial disruption' of a school activity or a threatened harm to the rights of others" had been shown; the fact that B.L.'s speech, when posted, "might well be transmitted to other students, team members, coaches, and faculty"; and the "message" communicated by the post and whether it implicated matters of legitimate concern to the school's special interests or more conventionally protected content. *See* 141 S. Ct. at 2047. Moreover, the additional specific

considerations that the Court identified—whether the school can be said to be acting *in loco parentis* in regulating the speech; whether off-campus regulation threatens a student's ability to engage in certain speech "at all"; and whether the speech implicates interests in protecting unpopular ideas, *id*. at 2046—all fit comfortably within the three-factor framework we articulated in *McNeil*, particularly *McNeil*'s third factor. Properly applied, our sufficient-nexus test avoids the concerns that the Court identified about school regulation of off-campus speech. We therefore must apply the *McNeil* sufficient-nexus test to the speech at issue here, keeping in mind the additional considerations identified in *Mahanoy*.

**3**

Under those standards, we think it is clear that Epple's speech bore a sufficient nexus to AHS to warrant disciplinary action by the school.

Epple emphasizes that the Instagram account was intended to be private and that it was never his intention "to cause any school disruption." But under *McNeil*, Epple's subjective intention to keep the account private is not controlling, and we must consider "whether it was *reasonably foreseeable* that the speech would reach and impact the school." 918 F.3d at 707 (emphasis added). Epple, of course, failed in his effort to keep the posts private, because a follower of the account told one of the targeted students about it. *See supra* at 10. Given the ease with which electronic communications may be copied or shown to other persons, it was plainly foreseeable that Epple's posts would ultimately hit their targets, with resulting significant impacts to those individual students and to the school as a whole. *See D.J.M. ex rel. D.M. v.*

*Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 762 (8th Cir. 2011) (upholding school discipline against D.J.M. for private instant messages to C.M. that contained threats towards classmates, stating that "a reasonable person should be aware that electronic communications can now be easily forwarded" and that, "[s]ince C.M. was a classmate of the targeted students, D.J.M. knew or at least should have known that the classmates he referenced could be told about his statements").

Of course, as *Mahanoy* makes clear, the mere fact that a student's off-campus communication finds its way to the school is not alone sufficient to warrant regulation by school officials. *See* 141 S. Ct. at 2047 (invalidating school's discipline over B.L.'s off-campus speech despite the fact that she used a medium that clearly "risk[ed] transmission to the school itself"). But the remaining *McNeil* factors strongly support the school's assertion of disciplinary authority here. Once the privacy of the account was breached, and knowledge of the posts rapidly (and predictably) spread, the "degree and likelihood of harm to the school caused or augured by the speech" was significant. *McNeil*, 918 F.3d at 707. The students who were the targets of the posts' vicious abuse reported that they felt "devastated," "scared," and "bullied," and that their grades suffered. *See supra* at 13–14. One targeted student missed multiple tests and days of school, and her parents eventually withdrew her from AHS. Even students who were not targeted by the posts became distraught and were among a group who spontaneously gathered together, "crying and yelling" and "too upset to go to class." The uncontested evidence shows that, as Assistant Principal Pfohl explained, the "AHS school counselors and mental health staff were inundated with students needing help to

handle their feelings of anger, sadness, betrayal and frustration about the racist posts and comments in the Instagram account."

Epple contends that the students' reactions to the speech cannot be given controlling weight, because those reactions were occasioned by the offensive content of the speech and therefore raise the specter of a "heckler's veto." He argues that "even the most racist expressive conduct such as promoting the swastika as part of a Nazi party rally is entitled to government protection" and that *Mahanoy* underscores the school's obligation to defend "unpopular expression." 141 S. Ct. at 2046. These arguments are unavailing on the facts of this case. For two reasons, "the relation between the content and context of the speech and the school" here does not present the danger of censorship and instead weighs heavily in favor of upholding the school's assertion of disciplinary authority. *McNeil*, 918 F.3d at 707.

First, once Epple's posts hit their targets, the school was confronted with a situation in which a number of its students thereby became the subjects of "serious or severe bullying or harassment targeting particular individuals"— which *Mahanoy* specifically identifies as an "off-campus circumstance[]" in which "[t]he school's regulatory interests remain significant." 141 S. Ct. at 2045. As Epple acknowledges, he was expelled on the ground that he had engaged in "bullying" within the meaning of the generally applicable and speech-neutral prohibitions contained California Education Code section 48900.4.[4] Although

---

[4] *See* CAL. EDUC. CODE § 48900.4 (authorizing expulsion if a student "has intentionally engaged in harassment, threats, or intimidation,

Epple may be correct that his parents have the primary responsibility for policing his off-campus use of social media, the school's authority and responsibility to act *in loco parentis* also includes the role of *protecting other students* from being maltreated by their classmates. Epple's conduct here strongly implicated that "significant" interest of the school. *See Mahanoy*, 141 S. Ct. at 2045.

Epple is quite wrong in suggesting that the specifically *race-based* nature of the harassment here somehow immunizes it from the school's authority to protect its students from experiencing "serious or severe bullying or harassment." *Mahanoy*, 141 S. Ct. at 2045; *cf. R.A.V.*, 505 U.S. at 389 (noting that general laws against harassing conduct and other forms of employment discrimination may be violated by speech). Indeed, a *failure* by the school to respond to Epple's harassment might have exposed it to potential liability on the theory that it had "failed to respond adequately" to a "racially hostile environment" of which it had become aware. *See Monteiro*, 158 F.3d at 1033 (citation omitted); *see also id.* at 1034 ("It does not take an educational psychologist to conclude that being referred to by one's peers by the most noxious racial epithet

---

directed against . . . pupils, that is sufficiently severe or pervasive to have the actual and reasonably expected effect of materially disrupting classwork, creating substantial disorder, and invading the rights of . . . pupils by creating an intimidating or hostile educational environment"); *id.* § 48900(r) (authorizing expulsion for "bullying," which includes acts defined in § 48900.4 that target a student and may reasonably be expected, *inter alia*, to substantially interfere with the student's "academic performance" or "ability to participate in or benefit from" the school's services, or to have a "substantially detrimental effect on the pupil's physical or mental health").

in the contemporary American lexicon, being shamed and humiliated on the basis of one's race, and having the school authorities ignore or reject one's complaints would adversely affect a Black child's ability to obtain the same benefit from schooling as her white counterparts.").

Second, Epple's posts do not stand on the same footing as his example of the "racist expressive conduct" of those who use "the swastika as part of a Nazi party rally." For one thing, Epple never contended in the proceedings below that, like swastika-waving Nazis, he was actually espousing and communicating the view that Black people are supposedly inferior. Although his summary judgment motion described the images as "politically charged" and as "seemingly advocat[ing] for a particular political ideology through the use of satire," Epple's declaration in support of that motion explained his posts as simply "juvenile and offensive" attempts at "humor" that were posted "with the sole intention of entertaining my friends." As a result, his claim that the school was somehow censoring the promotion of a disfavored ideological message rings hollow. Moreover, given the extraordinary nature of the abuse Epple targeted at specific classmates, his discipline does not raise the specter of punishment based on a "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509. On the contrary, even assuming *arguendo* that Epple's posts did not amount to "fighting words" or true threats, they were enough of a near-miss that, in the context of minors in a secondary school environment, they are nonetheless fairly viewed as "a particularly intolerable (and socially unnecessary) *mode* of expressing *whatever* idea the speaker wishes to convey." *R.A.V.*, 505 U.S. at 393; *see also Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307

F.3d 243, 267 (3d Cir. 2002) (noting that, for First Amendment purposes, "the public school setting is fundamentally different from other contexts, including the university setting"). Students such as Epple remain free to express offensive and other unpopular viewpoints, but that does not include a license to disseminate severely harassing invective targeted at particular classmates in a manner that is readily and foreseeably transmissible to those students.

Epple again emphasizes that he did not ever intend for the targets of his posts to ever see them. But having constructed, so to speak, a ticking bomb of vicious targeted abuse that could be readily detonated by anyone following the account, Epple can hardly be surprised that his school did not look the other way when that shrapnel began to hit its targets at the school. And, as we have explained, recognizing an authority in school administrators to respond to the sort of harassment at issue here presents no risk that they will thereby be able to "punish[] students engaged in protected political speech in the comfort of their own homes." Epple's actions had a sufficient nexus to AHS, and his discipline fits comfortably within *Tinker*'s framework and does not threaten the "marketplace of ideas" at AHS. *Mahanoy*, 141 S. Ct. at 2046.

**4**

Although Chen's involvement in the account was substantially more limited than Epple's, we conclude that he was nonetheless properly subject to discipline by the school as well.

As we have explained, *see supra* at 10–11, Chen contributed to the Instagram account multiple times in ways that were directly related to AHS. For example, he took a picture of a Black student during class, without her

permission, and captioned it in the Snapchat app with the statement, "She's eating a fucking carrot." Epple thereafter posted that Snapchat screenshot to the yungcavage account. Chen commented "Its too good" on a post comparing a specific Black classmate to a gorilla, and he responded to another student's criticism of that post with the statement, "fuck YOU you dirty zookeeping son of a bitch." Chen called a non-Black student a "nigger" after that student guessed (incorrectly) that he created the account; and he "liked" a post in which Epple called a Black classmate a "nigger."

Although Chen's participation in the targeted abuse of specific students in these posts was much less than Epple's, he affirmatively liked two such posts and denounced, in vulgar terms, another follower who criticized one such post. At the very least, Chen is akin to a student who eggs on a bully who torments classmates. A school may properly take account of such affirmative participation in what ended up, after the account became known, as abusive harassment targeted at particular students. Moreover, several of the targeted students stated that the severity of the hostile environment they experienced was exacerbated by the knowledge that other students participated in the account and "liked" the abusive posts. As with Epple, Chen's conduct has a sufficient nexus to AHS and, under *Tinker*, was properly subject to discipline.

*      *      *

Accordingly, we reject Epple's and Chen's claims that their First Amendment rights were violated by Defendants' disciplinary actions towards them.

# C

We reject Epple's and Chen's arguments that Defendants violated their rights under the California Constitution and California Education Code §§ 48950(a) and 48907.

"Because California follows federal law for free expression claims arising in the school setting," *Dariano v. Morgan Hill Unified Sch. Dist.*, 767 F.3d 764, 776 n.4 (9th Cir. 2014), Epple's and Chen's reliance on the California Constitution fails for the same reasons discussed above. *See California Teachers Ass'n v. Governing Bd. of San Diego Unified Sch. Dist.*, 53 Cal. Rptr. 2d 474, 480 (Ct. App. 1996).

Epple's and Chen's reliance on California Education Code § 48950(a) also fails. Section 48950(a) provides that a school district may not discipline a student "solely on the basis of conduct that is speech or other communication that, when engaged in outside of the campus, is protected from governmental restriction by the First Amendment to the United States Constitution or Section 2 of Article I of the California Constitution." CAL. EDUC. CODE § 48950(a). But, as we have explained, Epple's and Chen's speech "outside of the campus" here is *not* "protected from governmental restriction by the First Amendment." The limitation in § 48950(a) was therefore not violated here. Moreover, § 48950(d) provides that "[t]his section does not prohibit the imposition of discipline for harassment, threats, or intimidation, unless constitutionally protected," *id*. § 48950(d), and for the reasons we have set forth, the relevant speech at issue constituted harassment that, under the circumstances of this case, was not "constitutionally

protected."    Epple's and Chen's reliance on § 48950 therefore fails for this additional reason.

Epple's and Chen's argument under California Education Code § 48907 fares no better.    That section provides, in relevant part, that "[p]upils of the public schools, including charter schools, shall have the right to exercise freedom of speech and of the press."  CAL. EDUC. CODE § 48907(a).  But California courts have made clear that this provision "constitutes a statutory embodiment of the *Tinker* and related First Amendment cases at that time." *Smith v. Novato Unified Sch. Dist.*, 59 Cal. Rptr. 3d 508, 516 (Ct. App. 2007) (quoting *Lopez v. Tulare Joint Union High Sch. Dist. Bd. of Trs.*, 40 Cal. Rptr. 2d 762, 771 (Ct. App. 1995)).[5]    Therefore, § 48907 does not affect our earlier analysis, and it does not preclude Defendants from disciplining Epple and Chen here.

## III

Epple claims that he was deprived of his due process right to a fair hearing before an impartial tribunal because Trutane, a member of the AUSD Board who voted to expel him, was biased against him.  As noted earlier, *see supra* at 17–18, the district court dismissed this claim on the ground that Epple had failed to exhaust judicial remedies, as assertedly required to attempt to avoid the preclusive effect of the administrative decision against Epple.  *See Doe*, 891

---

[5] *Smith* recognized that "section 48907 provides broader protection" than the federal First Amendment "for student speech *in California public school newspapers*."  *See* 59 Cal. Rptr. 3d at 516 (emphasis added).  But as relevant here, § 48907 provides no greater protection than the First Amendment.  *Id.*

F.3d at 1155. However, Epple subsequently did file a petition for a writ of mandate challenging the ACBE's decision, and the superior court denied the petition.[6] Because Epple did not appeal that decision and it is now final, he contends that he has exhausted his judicial remedies and that we therefore must vacate the district court's dismissal of his due process claim. But even if Epple is correct that his judicial remedies have now been exhausted, we affirm the dismissal of Epple's due process claim on the separate ground that the *state court's* decision rejecting Epple's claims of bias has preclusive effect here.

The California superior court expressly considered Epple's claim that his "[p]rocedural due process" rights were violated in "that he was denied a fair hearing because of bias by Trutane." The court rejected that claim, holding that "the record does not demonstrate an unacceptable probability of bias by the members of the AUSD that ordered his expulsion." The court reasoned that "Trutane's involvement in various community activities related to supporting impacted students and eliminating racism in the schools during [the] time period at issue did not establish the 'concrete bias, personal interest, or malice' necessary to require her recusal." Having litigated and lost this due process issue in state court, Epple may not now relitigate

---

[6] Under California law, a petition for a writ of administrative mandamus under Code of Civil Procedure § 1094.5 is the ordinary means for "inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer." CAL. CODE CIV. PROC. § 1094.5(a); *Doe*, 891 F.3d at 1155.

that issue in federal court.

"In determining the preclusive effect of a state administrative decision or a state court judgment, we follow the state's rules of preclusion." *White v. City of Pasadena*, 671 F.3d 918, 926 (9th Cir. 2012). California's doctrine of "[i]ssue preclusion 'prevents a party from obtaining a second adjudication of an issue that has already been adjudicated against that party on the merits by a court of competent jurisdiction.'" *Hardwick v. County of Orange*, 980 F.3d 733, 740 (9th Cir. 2020) (quoting *Pajaro Valley Water Mgmt. Agency v. McGrath*, 27 Cal. Rptr. 3d 741, 745 (Ct. App. 2005)). "Issue preclusion applies: '(1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party.'" *Id*. (quoting *DKN Holdings LLC v. Faerber*, 352 P.3d 378, 387 (Cal. 2015)). Epple does not (and cannot) challenge the first, third, or fourth elements. Instead, he challenges only the second element, asserting that the issues are not identical because the due process standard applied by the California superior court differs from the federal due process standard recognized in our caselaw. We disagree.

Applying the standards set forth in *Nasha L.L.C. v. City of Los Angeles*, 22 Cal. Rptr. 3d 772 (Ct. App. 2004), the superior court held that a violation of due process occurs in the administrative context when there is "an unacceptable probability of actual bias on the part" of an actual decisionmaker. *Id*. at 780 (citation omitted). Epple contends that this standard is materially different from the federal due process standard, which he claims requires recusal if there is "even an appearance of bias." We discern no material difference between *Nasha* and federal

law on this point.

*Nasha*'s standard requiring either actual bias or an "unacceptable probability of actual bias" was drawn verbatim from *Breakzone Billiards v. City of Torrance*, 97 Cal. Rptr. 2d 467, 492 (Ct. App. 2000), which quoted that phrase from our decision in *United States v. Oregon*, 44 F.3d 758, 772 (9th Cir. 1994). And we, in turn, derived that standard from *Withrow v. Larkin*, 421 U.S. 35 (1975), in which the Court held that due process would be violated in situations in which "the *probability of actual bias* on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Id*. at 47 (emphasis added). That was the same standard applied by the Supreme Court in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), where the Court reaffirmed that due process requires a decisionmaker's recusal, not only when he or she "has 'a direct, personal, substantial, pecuniary interest' in a case," *id*. at 876 (citation omitted), but also when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Id*. at 877 (quoting *Withrow*, 421 U.S. at 47). Because, in applying *Nasha*, the superior court applied the same federal standard articulated in *Withrow* and reaffirmed in *Caperton*, Epple is wrong in contending that the superior court did not decide the identical federal due process issue that he seeks to relitigate here. *See also Williams v. Pennsylvania*, 579 U.S. 1, 4 (2016) (applying the same "objective standard that requires recusal when the likelihood of bias on the part of the judge ' "is too high to be constitutionally tolerable" ' " (quoting *Caperton*, 556 U.S. at 872 (in turn quoting *Withrow*, 421 U.S. at 47))).

Epple's contrary argument is based largely on a single out-of-context quotation from this court's decision in

*Stivers v. Pierce*, 71 F.3d 732 (9th Cir. 1995). In *Stivers*, we stated:

> There are two ways in which a plaintiff may establish that he has been denied his constitutional right to a fair hearing before an impartial tribunal. In some cases, the proceedings and surrounding circumstances may demonstrate *actual bias* on the part of the adjudicator. In other cases, the adjudicator's pecuniary or personal interest in the outcome of the proceedings may create an *appearance of partiality* that violates due process, even without any showing of actual bias.

*Id.* at 741 (citations omitted). Seizing on the latter sentence, Epple claims that it stands for the proposition that "even an appearance of bias in an administrative hearing gives rise to a violation of due process." But this statement is merely a reference to, and not an alteration of, the settled *Withrow* standard that has now been repeatedly reaffirmed by the Supreme Court. That due process standard does not require "any showing of actual bias," *id*., but will also apply upon a showing of a "*probability* of actual bias on the part of the judge or decisionmaker" that "is too high to be constitutionally tolerable." *Withrow*, 421 U.S. at 47 (emphasis added). *Stivers*'s reference to a constitutionally disqualifying "appearance of partiality" merely restates the *Withrow* rule in other terms.

Accordingly, the due process issue that Epple seeks to raise in federal court is one that he has already litigated and lost on the merits in a full and fair de novo review by a California state court. The state court's decision is

therefore entitled to preclusive effect, and it requires us to reject Epple's due process argument, regardless of whether we would have reached the same conclusion as the state court did. *See B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 157 (2015) ("[I]ssue preclusion prevents relitigation of wrong decisions just as much as right ones." (simplified)).

## IV

For the foregoing reasons, we affirm the district court's judgment.

**AFFIRMED.**

---

GOULD, Circuit Judge, concurring:

I join Judge Collins's excellent opinion in full. I write separately to express my views on the topic of hate speech, disturbingly present in both the facts of the case before the panel and regrettably, a reemerging threat to society throughout the nation today. I reaffirm the viewpoint I stated when another case involving hate speech in schools came before this court: "Hate speech, whether in the form of a burning cross, or in the form of a call for genocide, or in the form of a tee shirt misusing biblical text to hold gay students to scorn, need not under Supreme Court decisions be given the full protection of the First Amendment in the context of the school environment, where administrators have a duty to protect students from physical or psychological harms." *Harper v. Poway Unified Sch. Dist.*, 455 F.3d 1052 (9th Cir. 2006) (Gould, J., concurring in the denial of rehearing en banc), *vacated on other grounds*, 549 U.S. 1262 (2007). The continued prevalence of hate speech

and crimes against American citizens and residents on the basis of race, ethnicity, religion, sexual orientation, gender identity, and disability is evidence of the enduring threat of hate crimes to the fabric of American democratic society and to the safety and security of individuals.[1]

In light of this threat, I write to underscore that the First Amendment and Supreme Court precedent do not require courts always to strike down a government entity's attempts to prevent harm to their citizens – especially in the context of hateful speech at schools harming children.

The Supreme Court in *Beauharnais v. Illinois*, 343 U.S. 250 (1952), upheld a criminal libel statute that sought to prevent the publications of items that subjected "citizens of any race, color, creed or religion to contempt, derision, or obloquy or which is productive of breach of the peace or riots." Though the viability of the *Beauharnais* decision has been called into question by our sister circuits,[2] the case

---

[1] The FBI collects data on the prevalence of hate crimes reported to the agency by participating law enforcement agencies. *E.g.,* Federal Bureau of Investigation, *2019 Hate Crime Statistics*, https://ucr.fbi.gov/hate-crime/2019. Even if the reporting of hate crimes represents a fraction of the overall population of a given citizenry, the existence of such hate crimes can serve as a reminder to a given individual that others in society do not see them as full, human members of society and that others pose a risk to their participation in a democratic society. *See e.g.,* Mari J. Matsuda, *Public Response to Racist Speech: Considering the Victim's Story*, 87 MICH. L. REV. 2320 (1989); National Museum of African American History & Culture, *The Evidence of Things Unsaid*, https://nmaahc.si.edu/explore/stories/evidence-things-unsaid.

[2] We have also previously expressed skepticism of *Beauharnais*. *See* Dworkin v. Hustler Mag. Inc., 867 F.2d 1188, 1200 (9th Cir. 1989) ("We agree with the Seventh Circuit that the permissibility of group

has not been overturned and the Supreme Court's rationale focused on protecting the dignity of the enumerated class of citizens remains persuasive. Courts should hesitate to question attempts by the government, through its elected bodies, to protect their constituents, and this deference is applicable both when the actions in question are undertaken at the federal level by the Congress of the United States and when actions to protect students are undertaken at the local level by an elected school board, such as in Albany, California. Some may believe that attempts to solve the persistent issue of hate speech are misguided and ill-advised; but in response, the measured words of Justice Frankfurter come to mind: "It may be argued, and weightily, that this legislation will not help matters; that tension and on occasion violence between racial and religious groups must be traced to causes more deeply embedded in our society than the rantings of modern Know-Nothings. . . . That being so, it would be out of bounds for the judiciary to deny the legislature a choice of policy, provided it is not unrelated to the problem and not forbidden by some explicit limitation on the State's power." *Id.* at 262. This is especially true in the context of

---

libel claims [discussed in *Beauharnais*] is highly questionable at best."). However, those decisions centered on the libel theory rationale within *Beauharnais* likely undermined by *New York Times v. Sullivan,* 376 U.S. 254 (1964), while the majority opinion in *Beauharnais* also embraced a broad conception of the legislature's ability to regulate hate speech due to its pernicious effects on citizens' ability to participate fully in the democratic process as another basis for its ruling. This rationale has reemerged throughout the years since the *Beauharnais* opinion, *see* R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 416 (1992) (Stevens, J., concurring in the judgment).

the present case, where school administrators, including members of the elected Alameda County Board of Education, tried to protect their students from hate speech that could reasonably be construed as containing an implied threat of violence. Possibly, the school district could have taken alternative routes, such as attempting to educate and reform the perpetrators of the hate speech in line with the school's role as educators. But our role is not to dictate education policy from the bench, but rather to ensure that the Constitution and the applicable laws were correctly followed. I conclude that the school district's actions, in light of the potential for violence, the substantial disruption of school activities, and the infringement upon the rights of other students to be physically secure in their learning environment, were permissible and benign to the system of free expression protected by the First Amendment. The possibility that government actions aimed at improving the lives of students may not eventually be fully effective is no reason to say that the school board cannot try to protect its students.

The context of the public school raises the stakes. The public school is a special institution within American society, serving as "the first opportunity most citizens have to experience the power of government. . . [and t]he values they learn there, they take with them in life." *New Jersey v. T.L.O.,* 469 U.S. 325, 385–86 (1985) (Stevens, J., concurring in part and dissenting in part). This comes with the understanding that even for public school officials, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). However, this understanding of the

role of schools comes with a companion understanding that schools serve an essential role in imbuing and inoculating positive values in children, such as teaching the values central to good citizenship. *See, e.g., Pierce v. Soc'y of the Sisters,* 268 U.S. 510, 534 (1925). One aspect of those values is a central understanding of the dignity and respect that must be afforded to all citizens and people, regardless of any personal characteristics or attributes like race, religion, and sexual orientation, and the role of that respect for the individual in the healthy functioning of a multiracial, pluralistic democracy. As Justice Brennan stated in *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970), we recognize "that respect for the individual which is the lifeblood of the law." *See also Faretta v. California*, 422 U.S. 806, 834 (1975). The flipside of that central understanding is that hate speech is antithetical to the values of this nation.

Hateful speech encourages hateful thoughts, which lead to hateful goals of individuals; those, in turn, lead to hateful actions and sometimes violence, resulting in harm to the public. No court would seriously entertain an argument that schools must teach hateful speech on the grounds of academic equality or fairness when it so clearly is antithetical to our values. Hate speech has no role in our society and contributes little or nothing to the free-flowing marketplace of ideas that is essential to protect in a school environment. Just as a school cannot be forced to teach hate speech, neither should it be forced to entertain and tolerate within its walls hate speech promulgated by arrantly misguided students. When school authorities take action to root out the persistent echoes of racism that arise from time to time in American society, courts should not stop them, instead allowing racist comments to be rooted out and not

deemed protected by the First Amendment. These principles apply with cogent force to hate speech that threatens to dehumanize ethnic or racial groups within our multiracial society.

We may properly consider the incalculable harm that hate speech can cause ethnic or racial minorities in the context of school settings. Justice Thomas's words are illustrative in this evaluation: "In every culture, certain things acquire meaning well beyond what outsiders can comprehend." *Virginia v. Black*, 538 U.S. 343, 388 (2003) (Thomas, J., dissenting). His words counsel us to keep in mind the differing cultural and historical circumstances that might lead different groups to experience hate speech differently. Children go to school to enrich their lives and gain knowledge and skills to assist their full and productive participation in society. But consider how an African American child must feel if confronted with images sent to other students portraying the child as inferior, as less intelligent and as less human. As in the facts of the case before us, African American children may be particularly sensitive to imagery portraying them as slaves or akin to animals. Similarly, Jewish children may be particularly sensitive to images portraying them as rats or vermin, or even insects, as was done in Nazi Germany as prelude to the Holocaust. Indeed, each ethnic, racial, or other minority group will recognize visual images or verbal phrasings that dehumanize their community and encourage hate to be visited upon them, resulting in the disruption or interference with their effective learning process. Such an inquiry must be fact-specific and unique to the circumstances of each case, but in an especially egregious example like the case before us today, the answer is clear, as expressed in the majority opinion. In my view, civilized

society should not tolerate imagery encouraging hate; government bodies, consistent with the Constitution, can and should be able to take steps to stop it.

We should understand the government, through our vast network of public schools, must be able to address systemic hatred towards minority groups within the boundaries of the school, consistent with constitutional limits placed upon government actors. Consider Justice Jackson's warning against "allow[ing] zeal for our own ideas of what is good in public instruction to induce us to accept the role of a super board of education for every school district in the nation." *McCollum v. Bd. of Ed. of Sch. Dist. No. 71, Champaign Cnty., Ill.*, 333 U.S. 203, 237 (1948) (Jackson, J., concurring). We have a role to play when constitutional rights, such as those involving free speech in the case before us, are implicated, but primary responsibility for the operation of the school rests with elected officials and their selected representatives, and we should not stand in the way of school boards protecting their own students from the vile effects of hate speech.

School boards properly have power to discipline the perpetrators of hate speech. Despite the lower court record indicating that some involved students allegedly boasted that "they were going to win" and not face the consequences of their hurtful speech, I conclude that culpable racist students are properly punished for their abhorrent actions, which in this case dehumanized African American students through imagery and verbiage harkening back to the days of slavery and the discredited language of eugenics.

I write to stress that school officials, and government officials more broadly, should not be unduly constrained in

their attempts to regulate hate speech for the purpose of protecting the intended targets of said speech. This may require some refining of the Supreme Court's prior guidance in its precedents. For example, while recognizing that my views on hate speech may be less protective of speech than some current doctrine, I would conclude here that the racist characterizations and images, dehumanizing African Americans students, is sufficient to show a threat of imminent violence, fights or other attacks on African Americans, including, within the school context, bullying and harassment. Justice Thomas, in his dissent in *Virginia v. Black* involving a state statute banning cross burning with an intent to intimidate, noted his disagreement with the majority opinion's rationale that "imput[ed] an expressive component to the activity in question [i.e., cross burning]." 538 U.S. 343, 388 (2003) (Thomas, J., dissenting). Instead, Justice Thomas focused on the intimidating conduct itself as grounds for upholding the Virginia statute. Refocusing our attention on the hate speech issues in this case, I conclude that "just as one cannot burn down someone's house to make a political point and then seek refuge in the First Amendment, those who hate cannot terrorize and intimidate to make their point." *Id.* at 394. In our case, the culprits believed that they could escape the consequences of their hate speech that generated indisputable fear and intimidation in their targeted student victims because their conduct was couched in avowed "speech." If the Supreme Court decides to reassess its precedents in this area, I urge them to not blink the fact of grievous harm that hate speech causes its targets. I also urge the Court not to give any First Amendment protection for racist hate speech. For example, the Court could consider modifying the *Brandenburg* test to require

only a probable and emerging threat of violence rather than imminent lawless action as a result of speech in order to regulate it. Regardless, I would adopt an expansive view of the ability of government officials who regulate schools to protect the future citizens they are bound to serve and educate.